**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **IN RE STAR GAS SECURITIES LITIGATION** | : | **No. 3:04cv1766 (JBA)** |

**RULING ON MOTIONS TO DISMISS [DOCS. ## 181, 184, 190]**

Defendants seek dismissal of this putative securities fraud class action complaint, brought under Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), as well as Sections 11, 12 and 15 of the Securities Act (5 U.S.C. §§ 77k, 77l(a)(2) and 77o). Oral argument on defendants' motions was held July 27, 2006, and for the reasons that follow, their motions will be granted.

## I. Factual and Procedural Background

The Consolidated Amended Complaint ("Compl.") is filed on behalf of the three lead plaintiffs appointed by this Court pursuant to the Private Securities Litigation Reform Act, see In re Star Gas Sec. Litig., 2005 WL 818617 (D. Conn. April 8, 2005), as well as two "representative plaintiffs" not appointed by the Court, who purport to represent a class of investors who bought Star Gas shares in reliance on a September 2002 prospectus and an August 2003 prospectus. Compl. ¶¶ 27-28. The defendants are Star Gas LLP ("Star Gas"), a Delaware master limited partnership

with its principal place of business in Stamford, Connecticut, which is in the business of home heating sales and repair; Star Gas LLC, the general partner of Star Gas; Irik P. Sevin, the CEO and Chairman of the General Partner from March 1999 to March 2005; Audrey L. Sevin, the Director and Secretary of the General Partner from March 1999 to March 2005 and Irik Sevin's mother; Hanseatic Americas, Inc., which held an ownership interest in the General Partner, and its Chairman, Paul Biddelman; Ami Trauber, CFO of the General Partner from November 2001 to May 2005; and three investment banks that underwrote the offerings of Star Gas common units in September 2002 and August 2003. Id. at ¶¶ 29-38.

**A. General Allegations**

The complaint alleges the following facts based on review of Star Gas' filings with the Securities and Exchange Commission ("SEC"), securities analyst reports, press releases and other publications, and interviews with "confidential witnesses," including 17 former Star Gas employees. The class period in this case runs from August 1, 2002 through October 18, 2004, when the price of Star Gas stock collapsed on announcement that Star Gas would not issue a quarterly distribution and was unable to meet the borrowing conditions under its working capital line. Id. at ¶¶ 1, 17. The fraud allegations largely center around a "Business Process Redesign Improvement Program" ("Business Improvement Program" or "BIP") that Star Gas initiated in April

2002 to improve the operations of its heating oil subsidiary, Petro Holdings, Inc. ("Petro"). Id. at ¶¶ 2-6. "Included among the steps taken by the [business improvement] task force was the creation and utilization of a modern call center and centralized dispatch center.... According to a press release issued by Star Gas on April 30, 2003, these moves were intended to increase efficiency and enable Star Gas to take advantage of the heating oil industry's fractionalized configuration to build a brand image to grow both organically and through acquisitions." Id. at ¶ 6. Star Gas outsourced its call center to a Canadian company in May 2003. Id. at ¶¶ 7, 54. Further, Star Gas consolidated its dispatch operations for oil delivery and service to 11 regional locations rather than 27 local offices. Id. at ¶ 11.

According to Confidential Witness 4, a former Customer Service Supervisor at Petro, the Canadian call center "did not know how to adequately handle customer service calls, billing or pricing issues," and "following the creation of the call center, the number of complaints lodged by Petro's customers increased drastically." Id. at ¶¶ 55-56. Confidential Witnesses 10 and 11, also former Customer Service Representatives, reported significant problems with the Canadian call center as well, and "'unusually high' customer attrition...." Id. at ¶¶ 57-58. These difficulties and increased customer attrition problems were corroborated by other Confidential Witnesses who served in the

capacity of Customer Service Representatives and Account Executives. See id. at ¶¶ 59-63. The Confidential Witnesses, including CW 1, "a former Financial Analyst and Consultant who worked at the corporate headquarters of Star Gas in Stamford, Connecticut from August 2001 until June 2004," also assert that individual defendants Sevin and Trauber knew about these customer attrition problems because CW 1 prepared monthly, quarterly and yearly reports for them. Id. at ¶¶ 52(a), 68, 70; see also id. at ¶¶ 71-75. Confidential Witness 12, a former Information Technology Support Specialist from October 2001 to November 2004, reported that he/she attended a meeting in February 2004 where "Defendant Sevin announced that in 2003, Petro experienced an average customer attrition rate of 17%." Id. at ¶ 76.

Plaintiffs also allege:

> ... Defendants failed to inform the investing public that the Partnership was suffering from significant on-going integration issues as a result of its numerous acquisitions during the Class Period. The successful implementation of the Business Improvement Plan took considerably longer than Defendants anticipated and adversely impacted Petro's customer base. This failure in implementation was particularly egregious because Star Gas was growing exponentially by acquiring companies but, unbeknownst to the investing public, the Partnership lacked the necessary infrastructure and internal controls to effectively manage its acquisitions. As a result, Petro was experiencing customer attrition well in excess of industry standards.
>
> In addition, ... Defendants failed to inform the investing public that Star Gas had not adequately hedged to protect itself from a sharp rise in heating oil prices. Thus, Star Gas was ill-equipped to deal

> with a surge in heating oil prices during the Class Period, and ultimately, was unable to pass along high wholesale oil prices to its retail customers.

Id. ¶¶ 13-14.

Plaintiffs further allege that "Star Gas's problems and deteriorating business seriously threatened its ability to pay out its quarterly distribution" and to mask its problems, "Star Gas was using borrowed money to pay quarterly distributions, which was inflating the value of the Partnership's units." Id. at ¶ 16(e)-(f).

On October 18, 2004, Star Gas announced "a substantial decline in earnings for the Petro division for the fiscal year ending September 30, 2004 and a further projected decline in earnings for the fiscal year ending September 30, 2005. As a result, the Partnership announced Petro would not be able to meet the borrowing conditions under its working capital line. The Partnership blamed the source of the problem on ... the inability to pass on the full impact of record heating oil prices to customers and the effects of unusually high customer attrition, principally related to its operational restructuring...." Id. at ¶ 17. The price of Star Gas common units dropped 80%, from $21.60 to $4.32, and the price of the senior subordinated units dropped 78% from $14.05 to $3.00 on October 18, 2004. Id. at ¶¶ 18-19. The first complaint in against Star Gas in this district was filed three days later.

Plaintiffs allege that defendants' motive for making false and misleading statements was to artificially inflate Star Gas' share price in order to "pav[e] the way for several unit offerings during the Class Period, totaling approximately $96.1 million," and to "obtai[n] numerous bank borrowings during the Class Period of $235 million." Id. at ¶¶ 159-60. The cash raised was "used, in significant part, to finance quarterly distributions to unitholders," which yielded "huge amounts of money" for the defendants. Id. at ¶ 160. Specifically, Irik Sevin received $1.05 million in distributions; Audrey Sevin received $987,330; Hanseatic Americas received $1.25 million; and the Star Gas LP received $1.5 million. Id. at ¶ 161. Plaintiffs further allege that because a portion of Irik Sevin's compensation was tied to the price of Star Gas shares, he had an incentive to inflate share value, and one confidential witness "who worked with Defendant Sevin on a daily basis [stated that] all of Sevin's decisions were always colored by the effect they would have on the value and benefits of the units he held in the Partnership." Id. at ¶ 164. Finally, plaintiffs assert that "[a]dditional evidence of scienter can also be inferred from the fact that [several long-time] senior executives and/or directors either resigned or were terminated" between April and October 1, 2004. Id. at ¶ 165.

**B. Alleged False and Misleading Statements**

Plaintiffs specifically allege that the following statements issued by Star Gas were false and misleading:[1]

- In an August 1, 2002 press release, Star Gas stated, "the Partnership acquired 11 propane and heating oil companies for a total purchase price of $45.3 million. The companies serve 33,000 customers and had annual volume of 22 million gallons." Irik Sevin is quoted as being "extremely pleased with this quarter's results.... It was especially gratifying that the heating oil division's long-term business process improvement program and the propane division's disciplined management team enabled us to sustain the significant cost reductions undertaken this past winter." The press release attributes certain business success to "the very positive contribution our disciplined acquisition program has had despite the weather [and] the continuing progress the heating oil division's business process improvement task force has made on capitalizing on Petro's unique size in the home heating oil industry to operate most cost effectively and with greater customer sensitivity...." Compl. ¶ 103.

- The Prospectus issued in connection with the September 2002 public offering stated, "[c]ompetition with other companies in the home heating oil industry is based primarily on customer service and price. Long-standing customer relationships are typical in the industry." Id. at ¶ 105.

- A November 1, 2002 press release reporting Star Gas' quarterly results stated, "we are also pleased with the continuing progress our heating oil division's business process improvement task force has made on capitalizing on our unique size in the home heating oil industry to operate more cost effectively and with greater customer sensitivity...." It quotes Mr. Sevin as stating, "[w]e believe Star's strategy of maintaining a balanced capital structure is in the long-term interest of our unitholders. With that in mind, we successfully completed three equity issues during fiscal 2002, enabling us to fund acquisitions, reduce debt and maintain our investment grade BBB credit rating from Fitch Investors Services." Id. at ¶ 107.

---

[1] At oral argument, plaintiffs clarified that only the statements printed in bold type in the complaint, reproduced here, are alleged to be false and misleading, and the remainder (not included here) were inserted in the complaint for context.

- Star Gas' December 23, 2002 Form 10-K, filed with the SEC, stated, "[o]ver the last three fiscal years, the heating oil segment experienced average annual attrition of 0.4%." Id. at ¶ 109.

- The same Form 10-K, as well as the 10-K filed December 22, 2003 reported, "[t]he Partnership primarily uses derivative financial instruments to manage its exposure to market risk related to changes in the current and future market price of home heating oil, propane, and natural gas. The Partnership believes it is prudent to minimize the variability and price risk associated with the purchase of home heating oil and propane, accordingly, it is the Partnership's objective to hedge the cash flow variability associated with forecasted purchases of its inventory held for resale through the use of derivative instruments when appropriate. To a lesser extent, the Partnership also hedges the fair value of inventory on hand or firm commitments to purchase inventory....." Id. at ¶¶ 111, 131. The 10-K Forms were certified as truthful by defendants Irik Sevin and Trauber. Id. at ¶¶ 113, 133.

- "On January 21, 2003, Defendants issued a press release reporting 'record' fiscal 2003 first quarter results. The press release stated in pertinent part: ... 'We are extremely pleased with this quarter's results. While last year's very warm conditions make comparisons easy, it is gratifying that the Partnership was able to translate the colder temperatures into very attractive financial results.... Second, Star continued to realize significant operating expense improvements. The cost savings measures instituted in reaction to last year's aberrational warm weather have been sustained and the heating oil segment is beginning to achieve very tangible benefits from its Business Process Improvement Program, demonstrated by the success of its oil delivery scheduling initiative.... Fourth, the Partnership's disciplined acquisition program continued to positively impact both operating profits and be DCT accretive.'" Id. at ¶ 115.

- An April 30, 2003 press release reported Star Gas' second quarter results: "Operating income for the six months ended March 31, 2003 increased 38.7% over the comparable period in 2002 due primarily to a) volume increasing by approximately 28% due to colder temperatures; b) cost savings associated with the initial impact of the Petro Division's Business Process Redesign Improvement Program; c) 14 acquisitions

consummated since October 1, 2001; and d) a slight increase in per-gallon gross profit margins...." Id. at ¶ 117.

- The same April 30, 2003 press release reported that "on April 8, 2003, [Star Gas] purchased the SICO Heating Oil Company of Mount Joy, Pennsylvania. SICO had 19,000 customers and 15.5 million gallons of annual volume." Irik Sevin was reported to be "extremely pleased with this past winter's performance" and stated "Star is well financed." Id.

- "On August 6, 2003, Star Gas issued a press release entitled 'Star Partner, L.P. Reports 2003 Fiscal Third Quarter Results, Achieves Record Q3 Sales of $235.2 Million And Announces Six Acquisitions.' The press release stated in pertinent part: Star also announced that during the period from April 1, 2003 to date, the Partnership has acquired six heating oil and propane companies consisting of approximately 95,000 customers. These acquisitions are expected to add 81 million gallons of annual volume, representing an approximate 13% increase in Star's total volume." Attributing this purported success to several factors, Irik Sevin also stated "Of possibly even greater long-term significance, however, was the heating oil division's progress this past quarter in commencing the implementation of its Business Process Improvement Program, the results of which we hope to begin realizing in fiscal 2004." "Mr. Sevin went on to note, 'We were also gratified with the continuation of Star's active but disciplined acquisition program....'" Id. at ¶ 119.

- Also on August 6, 2003, Irik Sevin stated in a conference call with business analysts: "This quarter has been a very, very good quarter for us in terms of the more substantive movement forward." "To date, this past year, we're on target. Things have gone well. Our call center is operating superbly.... So at this stage, things are looking pretty good." Id. at ¶ 120.

- An August 13, 2003 prospectus issued in connection with a public offering of 1.7 million common units stated: "We enhance customer loyalty with our responsive at-home heating equipment repair and maintenance service, which we make available 24 hours per day, 7 days a week.... [B]ecause we sell heating oil with a pass-through pricing mechanism and maintain relatively low levels of inventory, we are not generally affected by changes in the level of oil prices." Id. at ¶ 122.

- The prospectus also stated, "our size allows us to provide higher levels of customer service for significantly lower cost per customer than our competitors and employ product branding to enhance customer retention. For example, in our heating oil operations, we are utilizing customer call center operations and technology-based service vehicle dispatch in order to maximize customer responsiveness while reducing overall operating costs." "We believe that these combined actions will further enhance our position with existing and potential customers and allow us to maintain or improve our customer retention." Id.

- Finally, the prospectus stated, "we enter into forward contracts or market hedges to maintain our margins and minimize our exposure to commodity price fluctuations." Id. at ¶ 123.

- On December 4, 2003, Star Gas announced its fourth quarter results. In the press release "Star also announced that during the three months ended September 30, 2003 the Partnership acquired three heating oil and propane companies consisting of approximately 47,000 customers, which are expected to add 53 million gallons of annual volume.... In fiscal 2003 the Partnership acquired ten heating oil and propane companies with over 100,000 customers, representing 112 million gallons of volume." Id. at ¶ 125.

- In the same press release, Irik Sevin was quoted as saying, "We are also excited with the continued success of Star's very active but disciplined acquisition program and the Business Process Improvement Program.... Management expects this entire Program to enhance operating income by approximately $15.0 million on an annual basis, of which $8.4 million is expected to be realized in 2004." Id. at ¶ 126.

- In a conference call on December 4, 2003, Sevin stated, "The improvement in customer service that we expected is in progress. Don't take that to mean anything other than what is said. It takes training, it takes re-education.... We're slowly, but surely improving the customer service level to where we think is going to allow us to grow internally as well as through acquisition." Id. at ¶ 127.

- Star Gas' Form 10-K filed with the SEC on December 22, 2003 stated: "Over the last three fiscal years, the heating oil segment experienced average annual attrition of 1.3%,

excluding the impact of acquisitions." Id. at ¶ 129.

- In a January 29, 2004 press release, Star Gas announced its "record" sales and operating income for the first quarter of 2004. "Operating income for the three months ended December 31, 2003 increased 8.4% to $31.9 million, from $29.4 million for the comparable period in fiscal 2003, despite the first quarter's warmer weather. This was primarily due to: a) the contribution from 12 acquisitions... b) heating oil and propane gross profit margins increasing 1.5 cents per gallon; and c) improved operating expenses and revenues from related products and services resulting from the heating oil division's Business Process Improvement Program." Id. at ¶ 135. Defendant Sevin attributed the success to Star Gas' "active but disciplined acquisition program," its "continue[d]... expansion," and the "Business Process Improvement Program, which was designed to capitalize on [the heating oil division's] size advantage within the highly fragmented home heating oil industry. While the full benefits of that program have yet to be realized, we are pleased that the Partnership began to achieve some tangible benefits in the first quarter of 2004." Id. at ¶ 136. Finally, Sevin stated in the press release that "Star was able to improve its liquidity, most recently through the sale of $35 million of long-term notes in January 2004." Id. at ¶ 137.

- During a conference call on January 29, 2004, Sevin stated: "Our ability to continue to manage our margins is linked to the business redesign program and the focus of our Propane division on operations. We are a service-oriented business, and by improving our service, by focusing on our service, we have been consistently able to move our gross profit margin and control our costs." Id. at ¶ 138. When asked about rising oil prices, Sevin stated, "... I don't know about competitors, when you are in the residential sector of this business, we have demonstrated an ability to pass along higher costs [to customers]." Id. at ¶ 139.

- On April 29, 2004, Star Gas announced its second quarter results in a press release, which quoted Sevin as stating: "We are pleased by a) Star's continued aggressive, yet disciplined acquisition program; b) the initial benefits from the Petro Division's Business Process Redesign Program.... Mr. Sevin went on to note: While we achieved certain benefits from the Petro Division's Business Process Redesign Program, they were not as significant as we had expected in this, the first year of its execution. However,

we now have the foundation of a platform, which we believe will enable us to capitalize on Petro's unique size to build a brand in the highly fragmented home heating oil industry...." Id. at ¶ 142.

- In a conference call on the same day, Sevin stated: "And the third thing was a loss of 3% of our customer base, which, again, acquisitions offset. When I say 3% loss in our customer base, let me just say it[']s both divisions; propane and heating oil. In looking at that and what happened, it really looks like the major driver here had to do with credit losses.... I think our business process redesign at the heating oil division must have had some impact on our customers in terms of customer stability. And while the numbers aren't showing it, I don't want to be so, so naïve or blind that we are attributing everything just to that credit factor." Id. at ¶ 143.

Plaintiffs assert that "[f]or the first time" in a July 29, 2004 press release, "Defendant Sevin publicly acknowledged that the Business Improvement Plan may have had a negative impact on customer attrition..." Id. at ¶ 145. However, they allege that Sevin also issued the following false and misleading statements in the press release:

- "As a result of the actions taken throughout this past year, we are beginning to see many of the operational and customer satisfaction benefits originally anticipated. Having made many of the adjustments required, we believe the new platform could provide Petro with a distinct operating and marketing competitive advantage going forward." Id. at ¶ 146.

- Star Gas had "an approximately 4% net customer loss resulting from both high energy prices and diminished service levels at Petro associated with the initial stages of" the BIP." Id. at ¶ 145.

- During a conference call also on July 29, 2004, Sevin stated, "I'm more optimistic this morning than I've ever been. And that's because we have a company under control." Id. at ¶ 147.

Plaintiffs allege in blanket fashion that most of the above statements were false and/or misleading "because Defendants failed to disclose and/or misrepresented the following material adverse facts, among others: (a) that the Partnership was experiencing serious problems as a result of its reorganization, consolidation and numerous acquisitions, particularly in the area of customer service, which was deteriorating rapidly, resulting in abnormal attrition of its customers; (b) that the cost savings from the restructuring in the heating oil division had not materialized and, in fact, had resulted in operating deficiencies that negatively impacted Petro; (c) that the Partnership lacked the infrastructure and internal controls to effectively manage the increased customers acquired during its numerous acquisitions; and (d) that the Partnership was masking its alarming attrition levels through its numerous acquisitions" and "that the Partnership's focus on operating excellence and customer sensitivity did not lead to better operating excellence, nor positive customer sensitivity as Petro continued to lose customers in excess of industry standards." Id. ¶¶ 104, 106, 108, 116, 118, 121, 124, 128, 140, 144, 1489. Plaintiffs allege that Star Gas' earning statements in and after January 2004 were false and misleading also because "Star Gas' problems and deteriorating business seriously threatened its ability to pay out its quarterly distribution, a major reason investors purchase

the Partnership's units; and ... Star Gas' business had deteriorated so sharply over the Class Period that it was in palpable danger of breaching financial and/or performance covenants in its loan agreements, thereby seriously jeopardizing its liquidity and viability." Id. at ¶¶ 140, 148.

Additionally, plaintiffs allege, based on the statements of the confidential witnesses, "that Petro was experiencing significantly more attrition than the reported 0.4%" or 1.3%. Id. at ¶¶ 110, 130. "In fact, according to CW12, [a former Information Technology Support Specialist] in 2003, Petro was suffering from an attrition rate of at least 17%." Id. at ¶¶ 52(l), 130. Finally, plaintiffs allege that the confidential witnesses have provided information that "the Partnership failed to disclose and/or misrepresented the fact that ... the Partnership [was] vulnerable to a financial disaster by failing to hedge 100% of its price plan contracts." Id. at ¶¶ 112, 132. The hedging statements also are alleged to be false and misleading "because the Partnership, at the Individual Defendants' direction, chose to make continued distributions to its unitholders throughout the Class Period to keep the value of the Partnership's units inflated rather than provide for the proper conduct of the business (i.e. adequately hedge the Partnership's cash flow against the rising price of oil or pay down the Partnership's debt covenants)." Id. at ¶¶ 112, 132.

**C. Motions to Dismiss**

The Star Gas defendants (Star Gas LLC, Star Gas LLP, the Sevins and Trauber) argue that plaintiff's complaint must be dismissed under Rules 9(b) and 12(b)(6) because plaintiffs have failed to allege the existence of any actionable misrepresentation or omission, have failed to sufficiently plead loss causation and scienter, and have failed to make sufficient allegations supporting controlling-person liability under § 20(a) of the Exchange Act. Def. Mem. of Law [Doc. # 185]. They also adopt the argument, as fleshed out by the Underwriter defendants, that plaintiffs have failed to allege sufficient facts to support claims under § 11 or § 12 of the Securities Act because they have not alleged any actionable misrepresentation or omission in the 2002 and 2003 prospectuses. Id.; see also Underwriter Def. Mem. of Law [Doc. # 182]. The Underwriter defendants further argue that plaintiffs' complaint must be dismissed because plaintiffs have not sufficiently alleged that the underwriters are "sellers" within the meaning of § 12, and because the subclass of "Representative Plaintiffs" who bring the claims against the underwriters lack standing as they were not appointed pursuant to the PSLRA's procedures. Finally, defendants Hanseatic Americas and Paul Biddelman move to dismiss the complaint on the grounds that it fails to adequately state that they were "controlling persons" of Star Gas, or that they culpably participated in Star

Gas' alleged misrepresentations; they also adopt the Star Gas defendants' arguments concerning the adequacy of plaintiffs' primary allegations of misrepresentations or omissions. Mem. of Law of Def. Paul Biddelman and Hanseatic Am., Inc. [Doc. # 191].

**II. Standard**

Under Rule 9(b), plaintiffs who allege fraud must state the "circumstances constituting fraud ... with particularity," Fed. R. Civ. P. 9(b), and this "rule is applied assiduously to securities fraud." Lentell v. Merrill Lynch & Co., 396 F.3d 161, 168 (2d Cir. 2005). The Private Securities Litigation Reform Act ("PSLRA") essentially codified the Second Circuit's pleading standard for securities fraud claims. See id. at 168; Novak v. Kasaks, 216 F.3d 300, 307-10 (2d Cir. 2000), cert. denied, 531 U.S. 1012 (2000). "To state a cause of action for securities fraud under section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5(b), a plaintiff must plead that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused plaintiff injury." Rothman v. Gregor, 220 F.3d 81, 89 (2d Cir. 2000) (internal quotation and citation omitted). A plaintiff who alleges that the defendant made a material false statement or omission must "specify each statement alleged to have been misleading, the reason or reasons why the

statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(2). The Second Circuit has held that, to survive a motion to dismiss under the PSLRA, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Novak, 216 F.3d at 306.

## III. Discussion

### A. Identification of Statements

Plaintiffs adequately identify specific statements that they contend were fraudulent and identify the speaker and the time and place the statements were made; all of the statements come from Star Gas press releases, forms filed with the SEC, or transcripts of recorded conference calls in which Defendant Sevin made particular representations on Star Gas' behalf. Plaintiffs list the dates of each of these communications and specify in bold type the sentences in each that they contend were fraudulent.

Plaintiffs' explanations concerning why they believe the challenged statements were false and misleading are sufficient. Although plaintiffs' explanations are listed in alternative form, and are repeated nearly verbatim for many of the statements, they are sufficiently specific to meet the standard of pleading with

particularity because they explain the business facts and circumstances plaintiffs believe existed within Star Gas and that they allege should have been publicly disclosed. In particular, plaintiffs' theory is that Star Gas' Business Improvement Program, and the call center in particular, were floundering and driving away customers, that Star Gas acquired many new companies to mask current customer attrition problems, that it failed to integrate the operations of the newly-acquired businesses, that the Business Improvement Program was not resulting in cost savings, and that Star Gas failed to disclose that these problems left it in danger of defaulting on its debts. Plaintiffs also allege that statements concerning hedging transactions were misleading because Star Gas represented that it hedged a "substantial majority" of the risks resulting from capped-price home heating oil contracts and inventory on hand, when Star Gas had not done so.

While plaintiffs adequately explain their theory of the case, the problem with the Consolidated Amended Complaint is that, as explained below, it fails to identify materially misleading statements made by the defendants. See I. Meyer Pincus & Assoc. v. Oppenheimer & Co., 936 F.2d 759, 761 (2d Cir. 1991). "Section 10(b) prohibits any person from using or employing any 'manipulative or deceptive device' in connection with the sale of a security." Id. Rule 10b-5 "prohibits the

making of 'any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.'" Id. (alteration in original). Section 11 contains a similar standard. The "central inquiry" under both Sections 10-b and 11 for determining whether a statement made in connection with the sale of a security is materially misleading "is therefore 'whether defendants' representations, taken together and in context, would have [misled] a reasonable investor' about the nature of the investment." Id. (quoting McMahan & Co. v. Wherehouse Entertainment, Inc., 900 F.2d 576, 579 (2d Cir. 1990)) (alteration in original).

A statement is material only if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Basic, Inc., v. Levinson, 485 U.S. 224, 231-32 (1988) (internal quotation and citation omitted).

**B. Business Improvement Program and Customer Attrition**

Plaintiffs assert that certain of defendants' statements between January 2003 and July 2004 about financial gains attributable generally to the Business Improvement Program were false and misleading. These statements include: that the BIP was

leading to " significant cost reductions" (8/1/02 press release); was making "continuing progress ... to operate more cost effectively with greater customer sensitivity (11/1/02 press release); was "beginning to achieve very tangible benefits... demonstrated by the success of its oil delivery scheduling initiative..." (1/21/03 press release); was contributing to increased operating income due to "cost savings associated with the initial impact of the [BIP]" (4/3/03 press release); was of "grea[t] long-term significance" (8/3/03 press release); resulted in "improved operating expenses and revenues" and that Star Gas was "pleased that the Partnership began to achieve some tangible benefits [from the program] in the first quarter of 2004" (1/29/04 press release); that Star Gas was realizing "the initial benefits from the Petro Division's [BIP]..." which, however, "were not as significant as we had expected..." (4/29/04 press release); that "the new platform could provide Petro with a distinct operating and marketing competitive advantage going forward" (7/29/04 press release); and Defendant Sevin's statement that "I'm more optimistic this morning than I've ever been. And that's because we have a company under control" (7/29/04 conference call).

The only specific financial projection challenged by plaintiff was a December 4, 2003 press release in which Star Gas stated that the BIP was "expect[ed]... to enhance operating

income by approximately $15.0 million on an annual basis, of which $8.4 million is expected to be realized in 2004."

Related to the BIP, plaintiffs also challenge the accuracy of Star Gas' statements about customer satisfaction. These include statements that customer satisfaction and customer service were important to Star Gas' business: "the home heating oil industry is based primarily on customer service and price. Long-standing customer relationships are typical in the industry" (9/02 prospectus); "[w]e enhance customer loyalty with our responsive at-home heating equipment repair and maintenance service, which we make available 24 hours per day, 7 days a week..." (8/03 prospectus); "our size allows us to provide higher levels of customer service for significantly lower cost per customer than our competitors and employ product branding to enhance customer retention..." (same); that the BIP was enabling Star Gas to "operate more cost effectively and with greater customer sensitivity" (11/1/02 press release); that "[t]he improvement in customer service that we expected is in progress. ... It takes training, it takes re-education.... We're slowly, but surely improving the customer service level...." (12/4/03 conference call); and "[w]e are a service-oriented business, and by improving our service, by focusing on our service, we have been consistently able to move our gross profit margin and control our costs" (1/29/04 conference call). They also include

statements that the "call center is operating superbly" (8/6/03 conference call); and that Star Gas was "utilizing customer call center operations and technology-based service vehicle dispatch in order to maximize customer responsiveness while reducing overall operating costs" (8/13/03 prospectus).

In terms of specific figures, plaintiffs challenge the truthfulness of defendants' 2002 statement that "over the last three fiscal years, the heating oil segment experienced average annual attrition of 0.4%" (12/23/02 Form 10-K); its statement the following year that "over the last three fiscal years, the heating oil segment experienced average annual attrition of 1.3% excluding the impact of acquisitions," (12/22/03 Form 10-K); Sevin's statement revealing "a loss of 3% of our customer base" in the second quarter of 2004 (4/29/04 conference call); and an announced net 4% customer loss for third quarter 2004 (7/29/04 press release).

Whether these statements are actionable in this case turns on the Court's characterization of them. "Statements that are opinions or predictions are not per se inactionable under the securities laws. Statements regarding projections of future performance may be actionable under Section 10(b) or Rule 10b-5 if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." In re Int'l Bus. Machines Corp. Sec.

Litig., 163 F.3d 102, 107 (2d Cir. 1998) ("IBM"). However, statements that "lack... definite positive projections" are not actionable, and "liability may not be imposed based on statements that, considered in their entirety, clearly 'bespeak caution.'" San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Co., 75 F.3d 801, 811 (2d Cir. 1996) (citation omitted).

In IBM, 163 F.3d at 107-08, plaintiffs alleged the company misled investors by suggesting they would maintain quarterly dividends at a certain level, but then reducing dividends after experiencing financial difficulties. Plaintiffs alleged that earlier statements by the company's representatives that they were "not... concerned about being able to cover the dividend..." and "that we would plan on some modest revenue growth in the year" were misleading, but the Court of Appeals held that they were "plainly an expression of optimism that is too indefinite to be actionable under the securities laws." Id. at 108. The Court of Appeals further held that a "highly qualified expression of corporate optimism" or a "loose prediction [that] in no way promises to maintain the dividend at any stated level" was insufficient to state a claim. Id. at 109.

In San Leandro, 75 F.3d at 811, the defendants issued statements that the company "should deliver income growth consistent with its historically superior performance" and "we are optimistic about [next year]." (emphasis supplied). These

statements "were accompanied by information relating to the defection of consumers from [defendants'] Marlboro [brand cigarettes] to discount brands, as well as references to the difficulties of predicting the impact of the discount market." Id. The Second Circuit held that, in context, the challenged statements "reflect hope, adequately tinged with caution, [such] that the total mix of information available to the market cannot reasonably be found to be misleading." Id.

Star Gas' statements regarding the BIP fall into this category. The vast majority of the statements concerning the BIP were non-specific, optimistic statements such as that the Petro Division was making "progress" and "beginning to achieve very tangible benefits" and of "grea[t] long-term significance." As the Second Circuit held in San Leandro, 75 F.3d at 811, mere expressions of corporate "optimism" for the future are not actionable. See also Frazier v. Vitalworks, 342 F. Supp. 2d 142, 153 (D. Conn. 2004) (statements that company expected to have an "exciting year" and was "off to a good start" were inactionable as "generalized, optimistic statements of business performance"). Plaintiffs assert that inactionable "puffery involves generalized optimistic statements of future performance," but the challenged statements concerned Star Gas' present performance. Pl. Omnibus Mem. of Law in Opp. to Mot. to Dismiss [Doc. # 198] at 27 (emphasis in original). The Court disagrees both with

plaintiffs' interpretation of applicable caselaw as well as their characterization of the challenged statements. Statements that a program was making progress or beginning to achieve results are not promises of specific current performance, but optimistic statements that the program is under way and is hoped to yield good results in the future. In any event, plaintiffs cite no case law from this circuit supporting the legal proposition that the "puffery" exclusion only applies to forward-looking statements,[2] and on the contrary several courts in this circuit have held statements of present opinion to be inactionable as mere puffery. See In re Bristol-Myers Squibb Securities Litig., 312 F. Supp. 2d 549, 559 (S.D.N.Y. 2004) (statements that a new drug "represents one of the most important advances in cancer medicine..." and "is a first-in-class novel blockbuster drug for treating cancer" held to "constitute non-actionable opinion,

[2]Additionally, the cases cited by plaintiffs do not support their argument. See Raab v. General Physics Corp., 4 F.3d 286, 289-91 (4th Cir. 1993) (holding that projections in annual report of future growth were not misleading because annual report was based on previous year's results, projections were adequately tempered by warnings of future business slowdown in accompanying press release, and hopeful statements about future were not material; the court did not hold that only future projections would be actionable); Anderson v. Abbott Labs., 140 F. Supp 2d 894, 905 (N.D. Ill. 2001) ("claims [in annual report] that Abbott is a leader and has grown in certain market segments, potentially suggesting future performance," were inactionable because Abbott promised no future performance based on past success -- "these statements refer backwards.... Second, they are practically devoid of content. Vague statements about industry leadership and unquantified growth are classic puffery, and are generally not actionable.")

personal or corporate optimism and puffery."); In re Bayer AG Sec. Litig., No. 03 Civ.1546 WHP, 2004 WL 2190357, at *13 (S.D.N.Y. Sept. 30, 2004) ("claims that [defendant] acted in the interests of patient safety" in pulling drug off the market as soon as danger became apparent "are not actionable because they constitute puffery, i.e., exaggerated or general statements that make no specific claims on which plaintiffs can rely.") (internal citation, quotation marks and alteration omitted).

Regardless, plaintiffs' allegations must fail for the separate reason that the facts alleged in the complaint do not show that defendants had reason to know the statements were false and misleading when made. See In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 71-74 (2d Cir. 2001), cert. denied, 534 U.S. 1071 (2001) (holding plaintiffs adequately alleged § 10b claim where they alleged Scholastic obtained and reviewed sales and return data showing significant downward trends, and therefore knew at the time that assurances of "normal" return rates were false); see also Frazier, 341 F. Supp. 2d at 158 (plaintiffs failed to state a fraud claim where revenues from HIPAA compliance were less than defendants originally thought but plaintiffs did "not point to anything suggesting defendants knew that their predictions, when made, were false or based on incorrect data."). Plaintiffs assert that defendants knew the statements were false because "the cost savings from the

restructuring in the heating oil division had not materialized and, in fact, had resulted in operating deficiencies that negatively impacted Petro." However, plaintiffs' primary charge regarding the deficiencies in the BIP are related to the establishment of the Canadian call center, which the complaint alleges occurred in Spring of 2003. Compl. ¶ 9 (outsourcing arrangement was announced in a May 20, 2003 press release). Thus Star Gas could not have been under any obligation to disclose difficulties with the call center or the BIP prior to that time.[3] The optimistic statements about the BIP that plaintiffs challenge were all made between Fall 2002 and December 2003, and by Spring 2004, when, according to plaintiffs' allegations, the problems with the BIP had become apparent (over the 2003-2004 heating season), Star Gas was concomitantly more cautious about its

---

[3]Furthermore, Star Gas had ample factual reason to be optimistic about its financial situation through early 2004 because it in fact achieved large profits during this time. For example, the December 4, 2003 press release reported that fiscal 2003 sales increased 43% over 2002 and operating income had increased 85%, and plaintiffs do not challenge the accuracy of these representations. See Compl. ¶ 125. Similarly, plaintiffs' complaint cites without challenge Star Gas' January 29, 2004 announcement of a "record" sales increase of 12.7% compared to the first quarter of 2002, and an increase of 8.4% in operating income for the first quarter of 2004. Id. at ¶ 135. While plaintiffs contend that some of these record increases were fueled by corporate acquisitions rather than improvements under the BIP, the fact remains that during this time, Star Gas had reason to express optimism about its business generally, and no reasonable inference can be drawn that Star Gas did not believe its optimistic statements when made between fall 2002 and January 2004.

projections for the BIP (the 4/29/04 press release stated Star Gas was realizing "the initial benefits from the Petro Division's [BIP]..." which, however, "were not as significant as we has expected..."). Based on these allegations there is no basis to infer that defendants knew of serious problems with the BIP before the 2003-04 heating season and therefore no basis to infer that they knew at the time that their optimistic statements would be false or misleading.

The only specific figure Star Gas ever attached to the BIP was that it "expect[ed]" to save around $8.4 million in 2004, and $15 million per year in subsequent years due to the BIP (12/23/02 Form 10-K). This is a classic forward-looking projection, and "mere opinions and predictions of future performance are not actionable under the securities laws unless they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." Faulkner v. Verizon Communs., Inc., 156 F. Supp. 2d 384, 398 (S.D.N.Y. 2001). No reasonable investor would understand Star Gas' statement of "expected" savings to be a guarantee. Furthermore, as addressed above, the call center had not been implemented when this projection was issued, and therefore defendants had no current factual basis for disbelieving the projection when made.

The alleged fraudulent statements referencing customer

service follow this same pattern. Between Fall 2002 and Spring 2003 Star Gas issued a series of non-specific, optimistic statements about the importance of customer service in the oil industry and to Star Gas in particular, and attributing vague improvements in "customer sensitivity" to the BIP. Nothing in these statements could be reasonably interpreted as misleading, as they address either the home heating industry very generally or Star Gas' hoped-for business results, without making any specific guarantees whatsoever. After the call center became operational, in August 2003 Star Gas stated that "the call center is operating superbly," but by December 2003 Star Gas toned down its accolades, acknowledging that while "[t]he improvement in customer service that we expected [from the call center] is in progress. ... It takes training, it takes re-education.... We're slowly, but surely improving the customer service level...." (12/4/03 conference call). By January 2004, Star Gas was back to platitudes such as "[w]e are a service-oriented business...." None of these statements can reasonably be read to guarantee any particular level of performance by the call center or its employees, or any particular financial results from the call center for Star Gas.

Moreover, plaintiffs allege that the problems at the call center developed several months after Star Gas made the statement about "superb" operation in August. For example, Confidential

Witness 9, a former District Sales Manager for Petro, alleges that "there was increased customer attrition during the heating season directly following the set up of the call center (2003-2004)." Compl. ¶ 72. This is logical because that is when the call center likely would have experienced its largest volume of customer questions, requests and complaints. Based on the timing and context of these statements, it is not reasonable to infer that Star Gas knew of negative material facts concerning the call center at the time it issued its optimistic statements. After it became aware of operational problems, it appropriately tempered its statements with a cautionary note that there was still "training" and "re-education" to be done.

Finally, plaintiffs allege that Star Gas misrepresented the magnitude of its customer attrition. Star Gas' specific statements concerning attrition percentages are material statements of current fact that, if false, would be actionable. However, the complaint fails to sufficiently plead any basis for inferring that Star Gas' figures were false.

In the 2002 and 2003 prospectuses, Star Gas represented that its average attrition rates over the last three fiscal years were 0.4% and 1.3%, respectively. Irik Sevin's April 29, 2004 conference call statement revealed "a loss of 3% of our customer base" in both the propane and heating oil divisions in the second quarter of 2004, and the July 29, 2004 press release announced

net 4% customer attrition in the first through third quarters of 2004. Compl. ¶¶ 143, 145.

Plaintiffs assert that Petro's customer attrition rate in 2003 was actually 17-20%. Compl. ¶¶ 65, 76. The 17% figure comes from a computer technician, CW 12, who states that during a company-wide meeting "sometime in February 2004," "Defendant Sevin announced that in 2003, Petro experienced an average customer attrition rate of 17%." Id. at ¶ 76 (emphasis in original). At oral argument, plaintiffs argued that Sevin's statement referred to net customer attrition (customer losses offset by customer gains). However, plaintiffs did not plead this in the complaint, nor can it reasonably be inferred from the complaint, because CW 12 was reporting what Sevin said, not personal knowledge of Star Gas's actual attrition figures. Therefore, CW 12 had no basis for knowing whether Sevin meant to refer to net or gross customer attrition; the reported comment refers to "average customer attrition," without specifying net or gross attrition. Accordingly, CW 12's statement is not sufficient to show that the reported net attrition figures in Star Gas's published statements were false or misleading.

The 20% attrition figure derives from the allegations of CW 7, a Petro truck driver from Maspeth, New York, who "reported that for his/her region, there was a 'huge' (estimated 20%) drop in customers during 2003." Compl. ¶ 65. Even assuming that the

truck driver's estimation of customer attrition in his/her region is accurate, such evidence would not be sufficient to controvert Star Gas's reported company-wide figures. Plaintiffs provide no basis for extrapolating from one delivery region to the entire sales area. Cf. Rombach v. Chang, 355 F.3d 164, 173 (2d Cir. 2004) (a "handful of incidents" where defendants failed to pay creditors "do not support an inference that the company was in trouble.").

For these reasons, plaintiffs do not adequately allege any false or misleading statement in Star Gas' announced customer attrition rates in the prospectuses, press release or conference call.

**C. Corporate Acquisitions**

Plaintiffs allege that Star Gas acquired new corporations to "mask" its unusually high customer attrition rates. They cite as misleading Star Gas' repeated characterization of its acquisition program as "disciplined" and "positive" for the company's overall business outlook, and charge that the cited customer attrition figures are false because they are boosted by acquisitions.

As defendants argue, in the 2003 Form 10-K, Star Gas stated that its listed customer attrition rate was exclusive of customers added through new acquisitions. See Declaration of Jonathan Lerner ("Lerner Decl.") [Doc. # 187], Ex. L at 12 ("heating oil segment experienced average annual attrition of

1.3%, excluding the impact of acquisitions"). The 2002 Form 10-K does not contain such a specific limitation on its 0.4% figure, but does state elsewhere that the additional gallons of propane and heating oil sold in fiscal 2002 were "largely offset by the impact of significantly warmer temperatures and to a much lesser extent by customer attrition in the heating oil segment," implying that the customer attrition figure provided is exclusive of acquisitions. Id., Ex. C at 23. Therefore these Form 10-Ks do not reveal a plan to cover up high customer attrition with acquisitions, but fully disclose that the attrition rates are calculated prior to the offsetting effects of acquisitions.

For this reason, plaintiffs' allegations that Star Gas acquired other companies for the misleading purpose of masking low customer satisfaction and high attrition cannot be supported and must be dismissed.

**D. Hedging Transactions**

Plaintiffs allege that the Form 10-Ks filed with the SEC in December 2002 and December 2003, as well as the August 13, 2003 Prospectus, were misleading because they stated that Star Gas hedged a "substantial majority" of its risks due to inventory on hand and price-capped contracts, and although Star Gas hedged about 91% of such risks in fiscal year 2003, it only hedged 47% of such risks in fiscal year 2004. As explained below, plaintiffs' allegations fail to state a claim because plaintiffs'

figure of 47% hedging, based on an undisclosed report of an unidentified expert witness, is insufficient.

Plaintiffs cite the following language in the Form 10-Ks as misleading: "The Partnership believes it is prudent to minimize the variability and price risk associated with the purchase of home heating oil and propane, accordingly, it is the Partnership's objective to hedge the cash flow variability associated with forecasted purchases of its inventory held for resale through the use of derivative instruments when appropriate. To a lesser extent, the Partnership also hedges the fair value of inventory on hand or firm commitments to purchase inventory....." Compl. ¶¶ 111, 131. As defendants point out, the Form 10-Ks also state:[4]

> The [home heating oil] segment currently enters into derivative instruments (futures, options, collars and swaps) covering a <u>substantial majority</u> of the heating oil it expects to sell to [its] price plan customers in advance and at fixed cost. Should events occur after a price plan customer's price is established that increase the cost of home heating oil above the amount anticipated, margins for the price plan customers whose heating oil was not purchased in advance would be lower than expected, while those customers whose heating oil was purchased in advance would be unaffected. Conversely, should events occur during this period that decrease the cost of heating oil below the amount anticipated, margins for the price plan customers whose

[4]Although the sections of the Form 10Ks and prospectuses proffered by defendants are not quoted in the complaint, it is proper for the Court to consider the "full text" of these documents because they are integral to evaluating the sufficiency of the claims in plaintiffs' complaint. <u>See</u> <u>San Leandro</u>, 75 F.3d at 809.

> heating oil was purchased in advance could be lower than expected, while those customers whose heating oil was not purchased in advance would be unaffected or higher than expected.

Lerner Decl., Ex. C at 12 (emphasis supplied).

At oral argument, plaintiffs argued that this disclosure language also is misleading because defendants hedged only 47% of the capped price contracts in FY 2004, and 47% is not a "substantial majority." Plaintiffs' complaint does not claim the "substantial majority" language as misleading. Given the PSLRA requirement that a complaint under the Exchange Act must "specify each statement alleged to have been misleading," 15 U.S.C. § 78u-4(b)(1), plaintiffs cannot amend their complaint at oral argument to add new allegations that previously undesignated passages of the prospectuses were misleading.

In their briefing and in their complaint, the gravamen of plaintiffs' argument was that Star Gas misleadingly suggested to investors that it had hedged all of its capped price contracts. However, the prospectuses cannot be read to put forth a plan or promise to hedge 100% of Star Gas' risks attributable to price plan contracts or inventory held for resale. See Pincus, 936 F.2d at 763 (holding that different sections of a prospectus may be read together to determine whether the document overall is misleading). A "substantial majority" cannot reasonably be interpreted to mean 100%. Likewise, the statement that the Partnership will hedge "when appropriate" cannot reasonably be

interpreted to mean that Star Gas will hedge all risks, but means that Star Gas will use its business judgment to determine which risks are appropriate for hedging. Furthermore, the second cited paragraph specifically warns that if oil prices increase, margins on sales to fixed-price customers whose oil was not purchased in advance will decrease. Given this warning, no reasonable investor would be misled into believing that Star Gas had employed derivative arrangements to hedge 100% of its risks.

Plaintiffs also assert that Star Gas made false and misleading statements in the 2003 prospectus when it stated, "we enter into forward contracts or market hedges to maintain our margins and minimize our exposure to commodity price fluctuations." Compl. ¶ 123. Elsewhere in the same prospectus, however, under the heading "Risk Factors," Star Gas stated:

> *A Significant Portion of Our Home Heating Oil Volume Is Sold to Capped-Price Customers and Our Operating Results Could Be Adversely Affected By Changes in the Cost of Supply That We Cannot Pass on to These Customers or Otherwise Protect Against*
>
> A significant portion of our home heating oil volume is sold to individual customers under an agreement pre-establishing the Maximum sales price of home heating oil over a twelve-month period.... We currently enter into forward purchase contracts, futures contracts and option contracts for <u>a substantial majority</u> of the heating oil we sell to these capped-price customers in advance and at a fixed cost. Should events occur after a capped-sales price is established that increases the cost of home heating oil above the amount anticipated, margins for the capped-price customers whose heating oil was not purchased in advance would be lower than expected....

Declaration of Marci Etter ("Etter Decl.") [Doc. # 186-2], Ex. B at 4 (emphasis supplied). The statements that Star Gas would "minimize" its exposure to risk, and that it enters into various risk-minimizing arrangements for "a substantial majority of the heating oil we sell" cannot reasonably be interpreted to mean that Star Gas had hedged all of its risks. On the contrary, Star Gas fully disclosed in the prospectus that some risk remained from a rise in oil prices, especially related to capped-price customers.

Plaintiffs' argument boils down to the assertion that, as a matter of business practice, Star Gas <u>should have</u> hedged 100% of its capped-price contracts because such was "standard practice within the oil industry." Compl. ¶ 79. Plaintiffs assert that "Defendants failed to disclose and/or misrepresented the fact that the Partnership did not <u>adequately</u> hedge against a sharp rise in heating oil prices during the Class Period and left the Partnership vulnerable to a financial disaster by failing to hedge 100% of its price plan contracts." Compl. ¶ 132 (emphasis supplied). Plaintiffs' second-guessing of Star Gas' business strategy, however, does not render the Form 10-Ks or the 2003 Prospectus materially misleading, as all of these publications in fact disclosed that Star Gas was subject to financial risk from the event of an increase in prices of oil for delivery under fixed-price customer contracts.

As the Second Circuit held in Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 7 (2d Cir. 1996), a prospectus that "implicitly and clearly communicate[s]" an investment risk is not materially misleading even if it "contain[s] no specific statement" that such a risk exists. In that case, the trust invested in mortgage-backed securities that plaintiffs asserted concealed a "bias" in favor of increasing interest rates, despite an assurance in the prospectus that the trust would "balance" the portfolio in such a manner that interest rate changes resulting in decreases in value of some investments would be offset by increases in other assets. Id. at 5. Because the prospectus warned elsewhere that, among other things, its investments were more at risk due to interest rate fluctuations than other investments, and that "a significant decline in interest rates could lead to a significant decrease in the Trust's net income and dividends," id. at 6, the Court of Appeals found that overall the prospectus was not misleading, id. at 7-8.

Similarly, Star Gas' 2002 and 2003 Form 10-Ks and the 2003 prospectus do not explicitly state that Star Gas had not hedged 100% of its capped-price contracts or advance inventory, but this fact is implicit in the warnings that Star Gas' margins may be affected by an increase in oil prices. Nowhere did Star Gas state any intention to hedge 100% of these risks; it stated only that it had hedged "a substantial majority" of them.

"[R]easonable minds could not differ on" the interpretation of Star Gas' published statements concerning hedging, and therefore these statements cannot be considered misleading under the "bespeaks caution" doctrine. See Pincus, 936 F.2d at 763.

The Court concludes that plaintiffs' allegations that Star Gas issued false or misleading statements about the extent of its hedging are insufficient as a matter of law to support claims under the Securities Act.

**D. Ability to Pass Price Increases to Consumers**

Related to the allegations of failure to disclose insufficiently hedged risks is plaintiff's allegation that Star Gas failed to sufficiently warn investors that it might be unable to pass along a large increase in oil prices to its customers. As discussed above, Star Gas adequately disclosed in the 2003 prospectus and elsewhere that there was a risk that an increase in oil prices might lead to a decrease in profit margins. Plaintiffs allege that Sevin's statement during the January 2004 conference call -- in answer to a question about whether the rising price of oil would negatively affect Star Gas' financial results -- that Star Gas "ha[d] demonstrated an ability to pass along higher costs" was false and misleading. Compl. ¶ 139. They argue that the falsity of this statement "is confirmed by" Star Gas' attribution of its declining earnings in October 2004 to its "inability to pass on the full impact of record heating

oil prices to customers. Compl. ¶ 150.

As an historical fact, however, plaintiffs do not contest the accuracy of Sevin's statement that Star Gas had demonstrated an ability in the past to maintain profit margins despite rising costs. More importantly, at no time during the January 2004 conversation did Sevin make any promises or guarantees that Star Gas would in the future be able to fully pass along rising costs to consumers. Plaintiffs' characterization of this statement as a "representation that [Star Gas] had and would continue to simply pass on high wholesale prices to retail customers," id. at ¶ 140, is just not supported by the actual language Sevin used during the conference call. Sevin's statement was nothing more than a projection of his future hoped-for margins, reasonably based on his knowledge of Star Gas' past performance, and therefore it is not actionable.

**E. Danger of Non-Compliance with Debt Covenants**

Plaintiffs allege that Star Gas' statement in April 2003 that it was "well financed" was false and misleading because Star Gas failed to disclose that it was in "palpable danger" of breaching is debt covenants. As detailed supra, n. 3, and by the facts alleged in plaintiffs' complaint, Star Gas was posting profits and record sales through January 2004. Therefore plaintiffs' claim that Star Gas was in danger of defaulting on its loans as early as April 2003 is not supported by their own

factual allegations and does not support an inference of fraud. Further, the statement that Star Gas was "well financed" is not sufficiently specific to be actionable; it contains no guarantees concerning the company's actual financial condition.

Finally, plaintiffs allege that Star Gas failed to disclose that its indebtedness could affect its ability to pay future distributions. Compl. ¶¶ 118, 140, 148. These allegations are insufficient primarily because plaintiffs do not point to any statement in which Star Gas discussed its ability to pay quarterly dividends, let alone promised to maintain them at certain levels or to maintain them at all. Second, the 2002 and 2003 Form 10-Ks explicitly disclose the amount of Star Gas' debt and the fact that some of its debt agreement contain "financial tests and covenants restricting the various segments and Partnership's ability to pay distributions, incur debt and engage in certain other business transactions." Lerner Decl., Ex. C at 30; Ex. L at 33.

For these reasons, plaintiffs' allegations concerning Star Gas' debt covenants are insufficient as a matter of law to state a securities law violation because they do not allege any statement that was actually false or misleading when made.

**F. Remaining Issues**

Having concluded that plaintiffs do not sufficiently allege that Star Gas made any false or misleading representations or

omissions in the challenged press releases, conference calls or prospectuses, the Court need not reach the issue of scienter (i.e. whether defendants acted with reckless disregard for the truth or had a motive to mislead). Additionally, because the Court has held that plaintiffs failed to allege any false or misleading representations or omissions in the 2002 and 2003 prospectuses, the claims against the Underwriter defendants under §§ 11 and 12 of the Securities Act also must be dismissed.

For the same reason, the plaintiff's allegations of controlling person liability as asserted against the Sevins, Trauber, Hanseatic Americas and Paul Biddelman must be dismissed, as the Court has held that plaintiffs did not adequately plead a primary violation of § 10(b). See SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996) (To state a claim for controlling person liability plaintiff must first show a primary violation of § 10(b) as well as that the individual controlled the primary violator and that the controlling person "was in some meaningful sense a culpable participant.").

## IV. Conclusion

Accordingly, defendants' motions to dismiss [Docs. ## 181, 184, 190] are GRANTED, the complaint is dismissed in its entirety and this case will be closed.

IT IS SO ORDERED.

/s/__________________________
JANET BOND ARTERTON
United States District Judge

**Dated at New Haven, Connecticut, this 21st day of August, 2006.**