UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| In re STAR GAS SECURITIES LITIGATION | : | Civil Action No. 3:04-CV-1766-JBA |
| | : | April 3, 2007 |

# MEMORANDUM OF LAW IN SUPPORT OF THE STAR GAS DEFENDANTS' MOTION FOR A MANDATORY RULE 11 INQUIRY AND MANDATORY FEE SHIFTING

Day Pitney LLP
James F. Stapleton (ct04267)
Thomas D. Goldberg (ct04386)
Terence J. Gallagher (ct22415)
One Canterbury Green
Stamford, CT 06901
Phone: (203) 977-7300
Fax: (203) 977-7301

Skadden, Arps, Slate, Meagher & Flom LLP
Jonathan J. Lerner (ct10605)
Maura B. Grinalds (phv0521)
Shannon Lazzarini, Esq.
Four Times Square
New York, New York 10036
Phone: (212) 735-3000
Fax: (212) 735-2000

*Attorneys for Defendants Star Gas Partners L.P., Star Gas LLC, Irik P. Sevin, Audrey L. Sevin and Ami Trauber*

**TABLE OF CONTENTS**


Page

TABLE OF AUTHORITIES ..... iii

PRELIMINARY STATEMENT ..... 1

I. PLAINTIFFS' FRIVOLOUS LEGAL AND FACTUAL CONTENTIONS ..... 3

A. Plaintiffs' Amended Complaint Was Demonstrably Frivolous in Many Separate and Independent Ways ..... 3

1. Plaintiffs' Frivolous Class Period ..... 3

2. Plaintiffs' Frivolous 1933 Act Claims ..... 4

3. Plaintiffs' Frivolous Claims Against Numerous Defendants ..... 5

4. Plaintiffs' Frivolous Claims Concerning Numerous Public Filings by Star Gas ..... 5

5. Plaintiffs' Frivolous Claims Concerning the BIP ..... 6

6. Plaintiffs' Frivolous Attrition Allegations ..... 7

7. Plaintiffs' Frivolous Allegations that Star Gas Was Using Acquisitions to Mask Attrition ..... 10

8. Plaintiffs' Grab-bag of Other Frivolous Alleged Omissions ..... 11

9. Plaintiffs' Frivolous Hedging Allegations ..... 11

10. Plaintiffs' Frivolous Scienter Allegations ..... 12

B. Plaintiffs Were Repeatedly Put on Notice of the Fatal Defects in the Amended Complaint ..... 13

C. On March 22, 2007, This Court Properly Denied Plaintiffs' Motion to Modify the Judgment Because Plaintiffs Demonstrated No Valid Basis For Such Relief ..... 15

II. THE COURT SHOULD IMPOSE MANDATORY FEE SHIFTING UNDER RULE 11 AND THE PSLRA ..... 16

A. Congress Enacted Mandatory Rule 11 Sanctions Such As Mandatory Fee Shifting to Eradicate Cases Like This ..... 16

B. Lead Plaintiffs Committed Substantial Violations of Rule 11(b) ..... 17

1. Lead Counsel Violated Rule 11(b)(2) ........ 18

2. Lead Counsel Violated Rule 11(b)(3) ........ 20

C. The PSLRA Requires the Court to Impose Sanctions Such As Mandatory Fee Shifting if It Determines that Rule 11(b) Has Been Violated ........ 21

D. Mandatory Fee Shifting Is Especially Appropriate Under the Circumstances Here ........ 22

E. The Violations of Federal Rule 11(b) A Substantial, Warranting the Award of Defendants' Reasonable Attorneys' Fees and Other Expenses Incurred in this Action ........ 26

CONCLUSION ........ 28

## TABLE OF AUTHORITIES

### CASES

Abner Realty, Inc. v. Administrator of General Services Admin., No. 97 Civ. 3075 (RWS), 1998 WL 410958 (S.D.N.Y. July 22, 1998) ....................24

Acito v. IMCERA, 47 F.3d 47 (2d Cir. 1995)....................19

Adams v. Ultralinks, Inc., No. 03 Civ. 5384 (SAS), 2005 WL 1863829 (S.D.N.Y. Aug. 5, 2005) ....................26

Aizuss v. Commonwealth Equity Trust, 847 F. Supp. 1482 (E.D. Ca. 1993)....................23, 25

Binghamton Masonic Temple, Inc. v. Bares, 168 F.R.D. 121 (S.D.N.Y. 1996) ....................25

Burekovitch v. Hertz, No. 01-CV-1277 (ILG), 2001 WL 984942 (E.D.N.Y. July 24, 2001) ....................24

Caisse Nationale de Credit Agricole-CNCA v. Valcorp, 28 F.3d 259 (2d Cir. 1994)....................18, 20

Chapman & Cole v. Itel Container International, 865 F.2d 676 (5th Cir. 1989) ....................21

Corroon v. Reeve, 258 F.3d 86 (2d Cir. 2001)....................20, 24

Denny v. Barber, 576 F.2d 465 (2d Cir. 1978)....................19

de la Fuente v. DEC Telecommunications, Inc., 259 F. Supp. 2d 250 (S.D.N.Y. 2003), aff'd, 82 Fed. Appx. 723 (2d Cir. 2003)...19, 27

Gurary v. Winehouse, 235 F.3d 792 (2d Cir. 2000)....................4, 25

Gurary v. Nu-Tech Bio-Medical, Inc., 303 F.3d 212 (2d Cir. 2002).................... passim

Kushner v. D.B.G. Prop. Investors, Inc., 793 F. Supp. 1161 (S.D.N.Y. 1992)....................23

Morley v. Ciba-Geigy Corp., 66 F.3d 21 (2d Cir. 1995) ..... 18

O'Brien v. Alexander, 101 F.3d 1479 (2d Cir. 1996) ..... 20, 23

Polar International Brokerage Corp. v. Reeve, 196 F.R.D. 13 (S.D.N.Y. 2000) ..... 20, 24

Sable v. Southmark/Environ Capital Corp., 819 F. Supp. 324 (S.D.N.Y. 1993) ..... 23

Security Farms v. International Brotherhood of Teamsters, 124 F.3d 999 (9th Cir. 1997) ..... 21

Simon DeBartolo Group, L.P., v. Richard E. Jacobs Group, 186 F.3d 157 (2d Cir. 1999) ..... 1, 21, 22, 26

## STATUTES

15 U.S.C. § 77k(a) ..... 19

15 U.S.C. § 78u-4(c) ..... 17

Fed. R. Civ. P. 11(b) ..... 17

Fed. R. Civ. P. 59 ..... 25

S.Rep. No. 104-98, at 13 (1995) ..... 17

Defendants Star Gas Partners L.P., Star Gas LLC, Irik P. Sevin, Audrey L. Sevin and Ami Trauber respectfully move this Court to make findings regarding Lead Counsel and Lead Plaintiffs' compliance with Federal Rule of Civil Procedure 11(b), as required under section 21D(c) of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, and to impose mandatory fee shifting.[1]

**PRELIMINARY STATEMENT**

In order to bolster enforcement of the PSLRA's policy against frivolous strike suits, the PSLRA imposes a mandatory review by the Court of Plaintiffs' compliance with Rule 11(b) of the Federal Rules of Civil Procedure ("Rule 11") and mandates that the Court "shall impose sanctions" upon any attorney found to have violated Rule 11. Simon DeBartolo Group, L.P., v. Richard E. Jacobs Group, 186 F.3d 157, 167 (2d Cir. 1999) (explaining that mandatory sanction provisions in PSLRA were inspired by Congress' conclusion "that the '[e]xisting Rule 11 has not deterred abusive securities litigation,'" therefore Congress enacted measure to "put 'teeth' in Rule 11.'"). As the Court of Appeals explained in Gurary v. Nu-Tech Bio-Med, Inc., 303 F.3d 212, 215 (2d Cir. 2002):

> The PSLRA dictates sanctions for frivolous securities fraud complaints and emphasizes the need not only to deter such abusive lawsuits, but also to compensate fully victims of this kind of abusive litigation. It requires district courts overseeing securities fraud suits to make specific findings, upon final adjudication of the action, as to whether all parties and all attorneys have

---

[1] Defined terms in Defendants' September 23, 2005 moving brief in support of their motion to dismiss the Amended Complaint ("SG Mem.") and December 20, 2005 Reply Brief ("SG Reply") and exhibit references ("Ex.") to the accompanying Declaration of Jonathan J. Lerner ("Lerner Decl.") have the same meaning herein. This memorandum also refers to Plaintiffs' November 23, 2005 Omnibus Memorandum in Opposition to Defendants' Motion to Dismiss ("Pl. Opp."), Plaintiffs' Memorandum of Law in support of their Motion for reconsideration and to alter and reopen this Court's August 23, 2006 judgment of dismissal and for leave to file a Second Consolidated Amended Complaint ("Pl. Mem."), the Star Gas Defendants' Memorandum of Law in Opposition to that Motion ("Def. Opp.") and accompanying Declaration of Jonathan J. Lerner ("Lerner II Decl."), the Court's August 21, 2006 Ruling on Motions to Dismiss ("Slip Op."), as well as the Court's March 22, 2007 Ruling on Motion to Modify the Judgment to Grant Leave to Amend the Complaint and Other Relief ("Mar. 22, 2007 Slip Op.").

> complied with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure. § 78u-4(c)(1). If the court determines that a violation has occurred, the imposition of sanctions is mandatory. § 78u-4(c)(2). The PSLRA further establishes a presumption that, "for substantial failure of any complaint to comply with any requirement" of Rule 11(b), the award shall be the full amount of the reasonable attorneys' fees and costs. §78u-4(c)(3)(A)

303 F.3d at 215 (2d Cir. 2002) (emphasis added).

We respectfully submit that if ever there were an appropriate occasion to find and impose mandatory fee shifting as mandated by the PSLRA, this is the case. In countless respects, this is the textbook case of the very abuses that were targeted by the PSLRA. Plaintiffs filed a baseless complaint with a grossly overblown Class Period, asserted a host of claims that had no factual or legal basis, and indeed were refuted by the Company's public filings, named a slew of individual and corporate defendants against whom they possessed no colorable claims whatsoever, and persisted in advocating frivolous and factually untrue positions even after being put on notice of their frivolousness in two pre-motion conferences. Plaintiffs also insisted on perpetuating their demonstrably false allegations and baseless legal claims up through and during oral argument in order to create so-called "factual issues" that purportedly could not be disposed of on a motion to dismiss. Only after losing the motion to dismiss did Plaintiffs abruptly and cavalierly abandon their baseless claims without any explanation, much less an apology to the Court and the Defendants for burdening them with these frivolous claims.

Compounding their violations of Rule 11 – and the considerable burdens and costs already imposed on the Court and Defendants – after this Court entered judgment dismissing Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6), Plaintiffs filed a baseless motion for modification of the Court's judgment of dismissal and for permission to file a second amended complaint ("SAC") which effectively admitted the frivolousness of their previously asserted claims by systematically repudiating them. On March 22, 2007, this Court

properly denied Plaintiffs' motion, noting, among other things, that Plaintiffs' motion did not advance any valid basis for vacating the previous judgment since it failed to cite any new law or new facts. To the contrary, Plaintiffs improperly proceeded as if this Court's previous ruling was merely "'an advisory opinion from the Court informing [plaintiffs] of the deficiencies of the [First Amended Complaint].'" (Mar. 22 Slip. Op. at 12) (citations omitted).

## I. PLAINTIFFS' FRIVOLOUS LEGAL AND FACTUAL CONTENTIONS

### A. Plaintiffs' Amended Complaint Was Demonstrably Frivolous in Many Separate and Independent Ways

#### 1. Plaintiffs' Frivolous Class Period

Even prior to the filing of Defendants' motion to dismiss, Plaintiffs had to know that their overblown Class Period stretching back to August 2002 – years before the BIP was implemented and oil prices spiked – was frivolous. Nevertheless, they improperly insisted on maintaining that Class Period apparently in order to: (1) keep the Lead Plaintiffs in the case;[2] (2) permit them to manufacture a panoply of meritless claims, including claims under the less exacting 1933 Securities Act based on the August 2002 and September 2003 Prospectuses that would otherwise have fallen outside the Class Period; and (3) inappropriately force a slew of additional Defendants, including perceived new "deep pockets" such as the Underwriter Defendants, into the case. Right up through oral argument Plaintiffs insisted on pressing their frivolous contention that the Class Period began in 2002 (see Lerner II Ex. 4 at 22-24) despite the

---

[2] Indeed, other proposed Plaintiffs' counsel candidly remarked at the February 23, 2005 hearing on motions for appointment of Lead Plaintiff on one of the motivations for such baseless allegations: "there doesn't seem to be any reason why these class – this longer class period is being used other than as a tactic to enable people to take control of this litigation." (Ex. Y at 92.)

Court's apt observation that the call center, which was the focus of the amended complaint, was not even in place until the heating season of 2003-04.[3]

Any doubt that Plaintiffs themselves recognized the complete absence of a colorable legal or factual basis for this bloated Class Period is dispelled by their own repudiation of it in their proposed SAC, which drastically reduced the putative class period from August 1, 2002 to October 18, 2004 (over 2 years) to December 4, 2003 to October 18, 2004 – less than 11 months (SAC ¶ 1), thereby conceding that their artificial Class Period, which was divorced from the factual contentions in the Amended Complaint, was indefensible.

**2. Plaintiffs' Frivolous 1933 Act Claims**

In the same vein, Plaintiffs' claims under the 1933 Act based on Prospectuses that were issued in August 2002 and September 2003, respectively – long before the actual implementation and testing of the BIP in the winter of 2003-04, and the spike in oil prices in 2004 upon which Plaintiffs' allegations of nondisclosures are predicated – were frivolous. No investor purchasing shares in the 2002 or 2003 offerings possibly could have been misled by the Company's failure to disclose the effect of events that had yet to occur. As the Court of Appeals held in Gurary v. Winehouse, 235 F.3d 792, 799 (2d Cir. 2000), where the shareholders' purchases occurred long before the challenged disclosures, any federal securities law claim is legally indefensible, thereby mandating sanctions pursuant to the PSLRA. 235 F.3d at 799-800.

---

3 **THE COURT**: What about the class period beginning August of '02? When a focus of your complaint is this failure of the customer service center, which the -- call center, which arose in the heating season of '03-'04, why would the defendants have had a reason to know in August of '02 that things would go wrong with the BIP? **MR. ARISOHN**: We're not alleging that they had reason to know things would go wrong with the BIP... We're alleging in August of '02 they already knew that things were not going well with the BIP. . . . it's our understanding from the numerous witnesses who have come forward to speak with us, 18 of whom are referred to in the complaint, that this [BIP] was a failure and known to be a failure from the outset. **THE COURT**: It's a little hard to see how anything is a failure at the outset. Isn't there a little running room? **MR. ARISOHN**: That's a fair comment, your Honor, but by August 2002 they had their running room. . . . the witnesses tell us this was a failure from the outset. . . Customers were unhappy with it from the outset. (Lerner II Ex. 4 at 22-24 (emphasis added).)

Acknowledging the baselessness of these 1933 Act claims, Plaintiffs' proposed SAC simply jettisoned all claims under the 1933 Securities Act, including claims under Sections 11, 12(a)(2) and 15, and all claims by "Representative Plaintiffs" Sand and Brighton based on the September 2002 Prospectus and the August 2003 Prospectus.

**3. Plaintiffs' Frivolous Claims Against Numerous Defendants**

Equally frivolous was Plaintiffs' attempt in the Amended Complaint to dragoon into this case a slew of new defendants (and perceived "deep pockets") based on Plaintiffs' groundless 1933 Act claims. These included Plaintiffs' claims against A.G. Edwards & Sons, Inc. (AC ¶ 36), UBS Investment Bank (AC ¶ 37) and RBC Dain Rauscher, Inc. (AC ¶ 38) – all of which were dropped in Plaintiffs' SAC -- after imposing enormous costs on these defendants and the Company, which has been required to indemnify them for the costs and significant attorneys fees they incurred in defending against these baseless claims. Plaintiffs have also abandoned their equally frivolous claims under the 1933 and 1934 Acts against Defendants Audrey L. Sevin (AC ¶ 32), Hanseatic Americas, Inc. (AC ¶ 33) and Paul Biddelman (AC ¶ 34), against whom Plaintiffs did not, and could not, allege any actionable misrepresentation, much less any facts to show they acted with the requisite scienter. Admitting that no bona fide claims ever existed against these defendants, Plaintiffs simply abandoned all claims against all of the new defendants improperly named for the first time in the Amended Complaint.

**4. Plaintiffs' Frivolous Claims Concerning Numerous Public Filings by Star Gas**

In a further effort to buttress their fatally flawed Class Period and maximize the potential "damages" in the case, Plaintiffs also trawled through the Company's public filings and forced Defendants to defend against Plaintiffs' litany of vague and meritless challenges to a host of public filings and statements from August 2002 to December 2003, including the August 1,

2002 Press Release (AC ¶¶ 103-04), September 18, 2002 Prospectus (AC ¶¶ 105-06), November 26, 2002 Press Release (AC ¶ 107), December 23, 2002 Form 10-K for 2002 (AC ¶¶ 109-114); January 21, 2003 Press Release (AC ¶¶ 115-116), April 30, 2003 Press Release (AC ¶¶ 117-118), August 6, 2003 Press Release and Earnings Call (AC ¶¶ 119-121); August 13, 2003 Prospectus (AC ¶¶ 122-124). In their SAC, Plaintiffs jettisoned their claims that any of these filings were false or misleading in any way, effectively conceding the ineluctable fact that these filings did not contain any material misrepresentations or omissions.

### 5. Plaintiffs' Frivolous Claims Concerning the BIP

Plaintiffs' claim that the BIP was a failure from the "outset of the prior class period in August 2002" was patently frivolous. See, e.g., AC ¶ 53 ("Prior to the Class Period [i.e., prior to August 2002] . . . the [BIP] was plagued with problems from its inception and resulted in significant customer attrition throughout the Class Period.") See also Pl. Opp. at 3 (claiming that the BIP was "a failure from the start in 2002"). Lead Counsel persisted in this frivolous position up through oral argument, by insisting to the Court that the BIP "was a problem program from the beginning" and as of the "very first day of our class period [August 1, 2002] . . . defendants were aware of the fact that the program was failing" (Tr. of July 27, 2006 Oral Arg. at 9:1-8,); see also id. at 22-24 (declaring that "by August 2002 they had their running room. . . . the witnesses tell us this was a failure from the outset. . . Customers were unhappy with it from the outset." (emphasis added).)

Unmasking this frivolous assertion, the Court properly observed:

> [P]laintiffs' primary charge regarding the deficiencies in the BIP are related to the establishment of the Canadian call center which the complaint alleges occurred in Spring of 2003. Thus Star Gas could not have been under any obligation to disclose difficulties with the call center or the BIP prior to that time.

Slip Op. at 27 (emphasis added: citations omitted).[4] Although Lead Counsel purportedly interviewed "dozens of confidential witnesses," there was not a shred of support for the allegation that the Company was experiencing any operational difficulties prior to the Winter of 2003-2004.

Conceding this reality, Plaintiffs finally admitted in their proposed SAC that the BIP "faced its first test with the onset of the 2003-04 heating season" (SAC ¶ 48). See also id. at ¶ 42 (the BIP was "implemented in the summer of 2003" and its "failure was manifest, according to numerous former employees, from the onset of the 2003-04 winter heating season").

**6. Plaintiffs' Frivolous Attrition Allegations**

Another demonstrably frivolous factual cornerstone of the Amended Complaint which Plaintiffs insisted on up through the grant of Defendants' motion to dismiss was that all of the Company's statements about attrition rates from 2002 through 2004 were false based on Plaintiffs' unsupported assertion that net attrition was "an astounding 17%" during 2003. (Pl. Opp. at 13-17, 28-29). See Pl. Opp. at 28 ("On four separate occasions throughout the Class Period, the Partnership announced false attrition rates," including 0.4% average annual for the three years ending September 30, 2002; 1.3% average annual attrition for three years ended September 30, 2003; a 3% loss of customer base for the quarter ended March 31, 2004; and a 4% loss of customer base for the quarter ended June 30, 2004.)

Despite their access to the Company's public filings (which they later adopted as true) directly negating this claim, Plaintiffs persisted in their repeated representations to the

---

4 Although this fact was repeatedly called to Lead Counsel's attention both by other proposed Lead Plaintiffs' counsel (See Ex. Y at 90-91; n.2, supra) and by Defendants' counsel (Tr. of Sept. 19, 2005 Telephonic Status Conf. at 12; see also, e.g., SG Mem. at 25-26, 78-79), Lead Counsel continued to advance and maintain the absurd contention that Defendants committed securities fraud by failing to disclose the effect of events that, as is evident from the face of the complaint, had not yet happened.

Court that the 17% figure referred to "net attrition," thereby rendering the Company's published attrition figures factually "false." These representations continued up through oral argument on July 27, 2006:

> **THE COURT**: And when you say "net attrition rate," you are referring to a bottom line figure?
>
> **MR. ARISOHN**: Yes, your Honor. It was our understanding, based upon the discussions we had with the witnesses, that the one comment that we refer to by Mr. Sevin was made at a meeting in Stamford where he referred to a 17% attrition rate for 2003. It's our understanding that was a net attrition rate, and that's the intent that we had when we framed the complaint.

(See Transcript of July 27, 2006 Oral Argument ("7/27/06 Tr."), Lerner II Ex. 4 at 6.)

> **THE COURT**: You talk about in your complaint that Petro's customer attrition rate in 2003 was 17 to 20 percent and that Star Gas misled the public about that. What fraudulent statement included information about Star Gas' customer attrition rate in 2003 as opposed to other periods?
>
> **MR. ARISOHN**: Well, there are several we allege in the complaint, your Honor. First of all, . . . there is a representation in the 10-K for the three-year period ending September 30th, 2003, that there was a 1.3% average annual attrition rate for three years. Now, if in 2003 the actual attrition rate is 17 to 20 percent, I think one can do the math to find out that it would be impossible to come up with a 1.3 average attrition rate with that as a basis. So I think that it's a fair inference that if somebody is alleging a 1.3 average attrition rate for three years, when in the very year there is a 17 to 20 percent attrition rate, that that is a false and misleading statement.

(Id. at 11-12 (emphasis added).) See also id. at 13 (MR. ARISOHN: "[T]here are attrition rates being put out to the public which are, we submit, false and misleading.")

Recanting this frivolous claim and their misrepresentations to the Court, in the SAC and their motion to alter the judgment, Plaintiffs affirmatively adopted the Company's published attrition figures in the 2005 10-K which directly refuted their 17% net attrition claim and fully corroborated the significantly lower attrition figures disclosed during the Class Period

(original and proposed). (SAC ¶¶ 105, 107).[5] Indeed, Plaintiffs specifically admitted that "annual net attrition" in 2003 was 1.5% (SAC ¶ 107) putting the lie to their previous "17% net attrition" claim. Given Plaintiffs' admitted possession of the 2005 10-K long before these representations were made, it is plain that either no reasonable factual investigation was made or there was a conscious decision to turn a blind eye to the Company's actual disclosures in order to try to survive a motion to dismiss.

The frivolity of this claim is compounded by the fact that the actual net attrition figures for both 2003 and 2004, which Plaintiffs belatedly adopted after dismissal, had also been published by Star Gas in its 2004 10-K on December 14, 2004 – over six months before Plaintiffs even filed their June 20, 2005 Amended Complaint. See Ex. W at 33. ("For fiscal 2003, before the increase in the price of home heating oil and the full implementation of the business process improvement program, the rate of customer loss was approximately 1.3%.") (emphasis added). Therefore, the net attrition rates for 2003 were clearly available to Plaintiffs when they drafted their Amended Complaint, and Plaintiffs -- who sued based on a "fraud on the market theory" – were clearly on notice of these public filings. Insisting to the Court this was a fact issue the Court could not resolve on the motion,[6] Plaintiffs willfully ignored the public filings

---

[5] The 2005 10-K demonstrates the baselessness of Plaintiffs' previous "17% net attrition" claim by explaining that:

Net customer attrition as a percent of the home heating oil customer base for fiscal 2003, 2004, and 2005 is found below:

| | **Fiscal Year Ended** | | |
|---|---|---|---|
| **Description** | **2003** | **2004** | **2005** |
| Gross Customer Gains | 14.9% | 13.1% | 12.9% |
| Gross Customer Losses | (16.4)% | (19.5)% | (20.0)% |
| Net Customer Attrition | (1.5)% | (6.4)% | (7.1)% |

2005 10-K at 28; see also id. at 5, 10, 13, 29.

[6] See also Lerner II Ex. 4 at 86-88. (**THE COURT**: […] Have you done the math? I mean, does 17% – could that have been gross attrition? **MR. ARISOHN**: Well, I guess – **THE COURT**: That's what sort of bothers me is that – and that's why I started the whole argument here today with understanding what was net and what was
*(cont'd)*

directly contradicting this false claim, preferring instead to see how they would fare on the dismissal motion.

Plaintiffs' failure to mention the actual attrition rates reported in the Company's 2004 and 2005 10-Ks prior to seeking reconsideration after the Court dismissed the Amended Complaint was a purely tactical decision designed to permit them to advance the admittedly spurious allegations that Star Gas's published attrition figures were false during the Class Period because "net attrition" in 2003 was allegedly 17%. (Slip Op. at 30-31.) This is the classic type of misconduct targeted by the PSLRA and proscribed by Rule 11.

**7. Plaintiffs' Frivolous Allegations that Star Gas Was Using Acquisitions to Mask Attrition**

In the Amended Complaint, Plaintiffs also frivolously challenged Star Gas's alleged failure to disclose that it was "masking its alarming attrition levels through its numerous acquisitions" – even though the Company persistently published attrition figures net of the effect of acquisitions. Rejecting this baseless allegation that "Star Gas acquired other companies for the misleading purpose of masking low customer satisfaction and high attrition," (Slip Op. at 32-33), the Court squarely held:

> [T]he[] Form 10-Ks do not reveal a plan to cover up high customer attrition with acquisitions, but fully disclose that the attrition rates are calculated prior to the offsetting effects of acquisitions.
>
> For this reason, plaintiffs' allegations that Star Gas acquired other companies for the misleading purpose of masking low customer satisfaction and high attrition cannot be supported and must be dismissed.

---

*(cont'd from previous page)*

gross. **MR. ARISOHN**: In all fairness, your Honor, with respect, I think that to get into that kind of a detailed factual debate at this stage of the case is not appropriate. . . . But this is a factual debate. The fact of the matter is in the course of our investigation this is what the witness says he heard. You know, if he heard gross we would have, you know, reported that fact, but there is no distinction there between gross and net. But everything else we heard and everything else we spoke about was talking about net attrition, not gross attrition. So the debate at this point in the pleadings whether he heard gross or net I think is inappropriate.) (Emphasis added).

(Id.; emphasis added) Not surprisingly, Plaintiffs discarded this frivolous claim in their proposed SAC.

### 8. Plaintiffs' Grab-bag of Other Frivolous Alleged Omissions

Further ignoring the actual disclosures made by the Company, Plaintiffs also frivolously challenged Star Gas's alleged failure to disclose that:

(a) it "lacked the infrastructure and internal controls to effectively manage the increased customers acquired during its numerous acquisitions" – even though Plaintiffs could cite no basis for this bald allegation, much less any statement by the Company rendered misleading by it (AC ¶ 5; Slip Op. at 13);

(b) it could not "simply pass on high wholesale prices to retail customers" – despite the Company's unequivocal disclosures to investors that it could not guarantee its ability to pass on price increases (see Lerner II Ex. 8; Slip Op. at 39-40);

(c) its "problems and deteriorating business seriously threatened its ability to pay out its quarterly distribution" – despite the fact that Plaintiffs cited no statements by Defendants discussing the Company's ability to pay distributions (Slip Op. at 41), in fact distributions were regularly made throughout the near entirety of the Class Period, and the Company pointedly disclosed the risks that distributions might not be made (Slip Op. at 41) and;

(d) it was "in palpable danger of breaching financial and/or performance covenants in its loan agreements" – again despite the fact that Plaintiffs identified no misleading statement concerning the Company's financial condition (Slip Op. at 40-41), the Company was in strong financial condition throughout most of the Class Period (id. at 40) and had warned investors that there were real risks that it could not always comply with its financial covenants, especially if economic conditions deteriorated as they did following the 2004 oil spike (see SG Mem. at 65-67).

Conceding the legal and factual baselessness of all of these allegations, Plaintiffs' SAC simply abandoned them without any explanation.

### 9. Plaintiffs' Frivolous Hedging Allegations

Plaintiffs also repeatedly made the preposterous claim that Star Gas fraudulently failed to disclose that it did not hedge 100% of its fixed price contracts (Pl. Opp. at 34; Slip Op. at 35), as allegedly required by "industry practice," even though Star Gas never made any

statement promising or purporting to hedge 100%, or promising to comply with "industry practice." (Slip Op. at 35-36; SG Mem. at 57-61; see also, e.g., Ex. L at F-17). In their SAC, Plaintiffs cavalierly dropped this claim for good reason: it was frivolous.

**10. Plaintiffs' Frivolous Scienter Allegations**

Plaintiffs also made a variety of demonstrably frivolous attempts to allege scienter based on inter alia:

(1) the Company's "several unit offerings during the Class Period" (AC ¶ 159) and "numerous bank borrowings," (AC ¶ 160), which were allegedly used to finance distributions to the unitholders and the individual defendants (AC ¶¶ 160-61) – despite controlling Second Circuit authority holding that such corporate motives were legally insufficient (see SG Mem. at 72-75; Slip Op. 41-42);

(2) Mr. Sevin's incentive based compensation and possession of Unit Appreciation Rights ("UARs") (AC ¶ 162-63), similarly defying controlling authority rejecting such compensation as a basis to find scienter and ignoring that Mr. Sevin had not exercised the UARs he held but rather, along with the Class, saw the value of his securities decline markedly;

(3) the alleged fact that six senior "executives and/or directors either resigned or were terminated" between April and October 2004 (AC ¶ 165) – even though none of these executives was alleged to have any involvement in any fraud; and

(4) an informal inquiry by the SEC that Plaintiffs knew did not result in any further action or even relate to the allegations in the Amended Complaint (AC ¶ 166; SG Reply at 35).

Admitting that these allegations of scienter were baseless, Plaintiffs dropped all of them in their proposed SAC.

**B. Plaintiffs Were Repeatedly Put on Notice of the Fatal Defects in the Amended Complaint**

As this Court noted in its most recent opinion denying Plaintiffs' motion to vacate the judgment, "the Court gave plaintiffs the opportunity to amend their pleadings after being given notice of the claimed defects at the pre-filing conference." (Mar. 22 Slip. Op. at 9.) In fact, following the filing of the Amended Complaint, Plaintiffs were specifically informed of the numerous defects in the Amended Complaint, but nevertheless chose to stand on their pleading. As the Court's Chambers Practices clearly state "[a]t the pre-filing conference, the plaintiff may be permitted to amend the complaint to address issues that would otherwise be subject to a motion to dismiss. However, if the plaintiff chooses not to amend and a motion to dismiss is granted, Judge Arterton ordinarily will not grant leave to amend." (Emphasis added.)

Specifically, at the September 19, 2005 pre-motion conference presided over by the Court, Plaintiffs were apprised of the numerous defects in their Amended Complaint. On the record, Star Gas's counsel explained that the Amended Complaint was subject to dismissal because, inter alia,: (1) Plaintiffs failed to identify any actionable misrepresentations or omissions given the Company's actual disclosures; (2) Plaintiffs' principal allegations were "frivolous" to the extent they claimed the Company should have disclosed back in 2002 problems with the BIP and problems arising from the spike in oil prices which did not occur until late 2003 or 2004; (3) the Company's detailed disclosures of problems relating to the BIP, oil price increases and customer attrition directly refuted Plaintiffs' allegations of omissions; (4) the challenged statements were forward-looking statements that were protected under the bespeaks caution doctrine, and were otherwise inactionable optimistic "cheerleading" statements; (5) Plaintiffs' hedging allegations – which boiled down to gripes about corporate management –

were outside the purview of the federal securities laws; and (6) Plaintiffs failed to allege the separate and independent element of scienter. (See Lerner II Ex. 1 at 11-15.)[7]

Even after the Court gave Plaintiffs the opportunity to amend to correct these defects,[8] Plaintiffs chose to stand on their complaint and to persist in advancing their frivolous claims. Following the pre-motion conference, Plaintiffs were again advised of the myriad defects in their pleading through the memoranda of law submitted by defendants in support of their motion to dismiss. Among other things, these detailed memoranda exposed the complete absence of any basis for Plaintiffs' factual and legal contentions concerning the two-year Class Period, the BIP, the impossible alleged 17% attrition value, the Company's hedging disclosures and other meritless challenges to the Company's public disclosures. Nevertheless, Plaintiffs stubbornly persisted in their baseless positions and claims.

In their motion to modify the judgment of dismissal, Plaintiffs contended that they requested an opportunity to amend their defective pleadings in a footnote of their memorandum of law in opposition to Defendants' motion to dismiss. Yet, as this Court has correctly observed in its opinion denying Plaintiffs' motion to vacate the judgment: "plaintiffs did not actually move

---

7 This conference was the second conference apprising Plaintiffs of the myriad defects in their pleading. As noted by defense counsel Terence Gallagher on September 19, 2005, counsel for both parties had held a previous conference to discuss the defects in their Amended Complaint the prior week. (See Lerner II Ex. 1 at 17.)

8 As the Court stated:

> [M]y purpose in having you outline your issues . . . is…to make sure we have a finalized complaint here and not one that would be given any leave to amend afterwards. But I think that was our whole purpose with the amended complaint – consolidated complaint. But Mr. Bernstein or counsel on behalf of the plaintiffs . . . am I correct in assuming that you have drafted your amended consolidated complaint to address as well as you can by allegations the inevitable motion to dismiss on the grounds that Ms. Grinalds has outlined?

(Lerner II Ex. 1 at 15.) In response, Mr. Bernstein, counsel for Plaintiffs unequivocally assured the Court that the Amended Complaint was the finalized operative pleading: "Yes, your Honor. This is Joel Bernstein, and the answer to that is yes." (Id. at 15.)

to amend, propose any specific amendments, or offer any indication of how any contemplated amendments might cure the alleged deficiencies." (Mar. 22 Slip Op. at 10.)

**C. On March 22, 2007, This Court Properly Denied Plaintiffs' Motion to Modify the Judgment Because Plaintiffs Demonstrated No Valid Basis For Such Relief**

On March 22, 2007, this Court issued an opinion denying Plaintiffs' motion pursuant to Federal Rules of Civil Procedure 59(e) and 60(b) for an order modifying the judgment entered by this Court on August 23, 2006 granting Defendants' motions to dismiss, and granting Plaintiffs leave to file a proposed SAC. (Mar. 22, 2007 Slip Op. at 1.) In denying Plaintiffs' motion, this Court held that Plaintiffs' failed to demonstrate any "valid basis" for vacating the August 23, 2006 judgment since they failed to identify any new law or any new evidence as defined in Rule 60(b) entitling them to relief. (Mar. 22, 2007 Slip Op. at 8-9.)

Plaintiffs' heavy reliance in their proposed SAC on the Company's 2005 Form 10-K did not constitute a valid basis to grant Plaintiffs' motion since "that document was available to them during briefing on defendants' Motions to Dismiss more than 7 months prior to oral argument on those Motions as it was filed on December 13, 2005, was attached to defendants' reply briefing [Doc. #204-5], and was discussed by both sides at oral argument." (Id. at 9.) Therefore, all of Plaintiffs' proposed amendments were "of such a nature that they could have been advanced previously." (Id. at 11.) In addition, this Court noted that "allowance of plaintiffs' proposed amendments in this case would as a practical matter render the Court's earlier Ruling on Motions to Dismiss 'an advisory opinion from the Court informing [plaintiffs] of the deficiencies of the [First Amended Complaint] and then an opportunity to cure those deficiencies'." (Mar. 22 Slip. Op. at 12) (citations omitted).

## II. THE COURT SHOULD IMPOSE MANDATORY FEE SHIFTING UNDER RULE 11 AND THE PSLRA

### A. Congress Enacted Mandatory Rule 11 Sanctions Such As Mandatory Fee Shifting to Eradicate Cases Like This

As the Second Circuit Court of Appeals has explained, Congress enacted the heightened Rule 11 requirements in Section 21D of the PSLRA to address "'the need to reduce significantly the filing of meritless securities lawsuits without hindering the ability of victims of fraud to pursue legitimate claims,'" given Congress' conclusion that "'[e]xisting Rule 11 has not deterred abusive securities litigation,'" Gurary v. Nu Tech Bio Med, Inc., 303 F.3d 212, 220 (2d Cir. 2002) (quotations and citations omitted). Thus, the "PSLRA's sanction regime was one of several provisions designed to reduce the economic incentives for bringing these actions." Id. In order to address Congress's twin concerns about "the failure of courts to impose sanctions pursuant to Rule 11, even in cases in which penalties were warranted" and "the fact that under existing Rule 11 practice, when a court did award Rule 11 sanctions, the award was "generally insufficient to make whole the victim of a Rule 11 violation," Congress imposed a mandatory Rule 11 inquiry, required that the court award mandatory sanctions upon the finding that an "attorney violated any requirement of [Rule 11(b)] as to any complaint" and created a presumption that if a complaint was filed in violation of Rule 11, defendants were entitled to an award of their attorneys fees incurred in defending the entire action. Id. (quotations omitted.)

Accordingly, the PSLRA significantly alters the way Rule 11 applies in private securities litigation by adding the following language to the 1933 and 1934 Securities Acts:

> (c) SANCTIONS FOR ABUSIVE LITIGATION –
>
> (1) MANDATORY REVIEW BY COURT – In any private action arising under this title, upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion.

(2) MANDATORY SANCTIONS – If the court makes a finding under paragraph (1) that a party or attorney violated any requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion, the court shall impose sanctions on such party or attorney in accordance with Rule 11 of the Federal Rules of Civil Procedure. . . .

(3) PRESUMPTION IN FAVOR OF ATTORNEYS' FEES AND COSTS –

(A) IN GENERAL – Subject to subparagraphs (B) and (C), for purposes of paragraph (2), the court shall adopt a presumption that the appropriate sanction--

(i) for failure of any responsive pleading or dispositive motion to comply with any requirement of Rule 11(b) of the Federal Rules of Civil Procedure is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation; and

(ii) for substantial failure of any complaint to comply with any requirement of Rule 11(b) of the Federal Rules of Civil Procedure is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred in the action.

Section 21D(c) of the PSLRA, 15 U.S.C. §78u-4(c). See S.Rep. No. 104-98, at 13 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 692.

**B. Lead Plaintiffs Committed Substantial Violations of Rule 11(b)**

Rule 11(b) states, in relevant part, that:

By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,

(1) it is not being presented for any improper purpose . . .

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

Gurary, 303 F.3d at 215 n.1 (quoting Fed. R. Civ. P. 11(b)).

**1. Lead Counsel Violated Rule 11(b)(2)**

Lead Counsel violated Rule 11(b)(2) by filing claims and advancing legal contentions that were not warranted by existing law or by any non-frivolous argument for the extension of existing law. Such claims included (1) Plaintiffs' claims under the 1933 Act which related to prospectuses issued and disclosures made months, if not years, before the alleged omissions could even have been made; (2) Plaintiffs' claims against the Underwriter Defendants which rested exclusively on these inactionable prospectuses; (3) Plaintiffs' claims against the remaining defendants under the 1934 Act based on these same early disclosures, or on alleged omissions or misrepresentations that were refuted by the Company's public filings or precluded under controlling authority immunizing an issuer from liability for statements of general corporate optimism and statements that bespoke caution; and (4) Plaintiffs' attempt to assert fraud claims against Defendants without meeting the stringent standards for pleading scienter.

Under subsection 2 of Rule 11(b), an argument or legal contention "constitutes a frivolous legal position for purposes of Rule 11 sanctions if, under an 'objective standard of reasonableness,' it is 'clear ... that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands.'" Caisse Nationale de Credit Agricole-CNCA v. Valcorp, 28 F.3d 259, 264 (2d Cir. 1994) ("Rule 11 targets situations where it is patently clear that a claim has absolutely no chance of success.") (citations omitted); accord Morley v. Ciba-Geigy Corp., 66 F.3d 21, 25 (2d Cir. 1995). Plaintiffs' contention that the alleged operational problems with the call center were required to be disclosed before the call center even existed falls squarely into this category. Indeed, the Court recognized the logical absurdity of Plaintiffs' contention: "Star Gas could not have been under any obligation to disclose difficulties with the call center or the BIP prior to that time." Slip Op. at 27 (citations omitted). There was no chance that Plaintiffs could have prevailed on the 1933 Act claims or Exchange Act claims predicated

on a "failure" to disclose facts and occurrences that, on the face of the Amended Complaint, had not yet occurred. As previously noted, this infirmity was repeatedly called to Lead Counsel's attention.

Section 11 of the 1933 Act requires the statements made in a registration statement to be true and not misleading by failure to disclose a material fact "when such part [of the registration statement] became effective." 15 U.S.C. § 77k(a). The registration statements and prospectuses challenged in the dismissed complaint became effective on September 18, 2002 and August 13, 2003. (See AC ¶¶ 105-106, 122-124.) On their face, these prospectuses could not support any 1933 Act claims based on disclosures that could not have been made before the Winter of 2003-04.

Nor was there any chance Plaintiffs could establish 1934 Act liability on the basis of these disclosures. It is likewise firmly established in this Circuit that defendants are not required to be "clairvoyant," and that "fraud by hindsight" – taken to a new extreme here – is not a valid basis for a securities law claim. See Acito v. IMCERA, 47 F.3d 47, 53 (2d Cir. 1995); see also Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978). Like the claims held frivolous in Gurary, it is obvious that claims based on a failure to disclose alleged operational difficulties with the call center before the call center even existed cannot be maintained under any view of section 10(b). See Gurary, 303 F.3d at 218 (holding plaintiff had substantially violated Rule 11(b) because "[b]ased upon the plain language of section 10(b) and well-settled case law, Gurary's October 31, 1996 purchase could not under any circumstances give rise to a Rule 10b-5 cause of action because that purchase occurred before any alleged deception began . . . ."); see also id. at 224; cf. de la Fuente v. DEC Telecommunications, Inc., 259 F. Supp. 2d 250, 262-63 (S.D.N.Y. 2003) (finding a substantial violation of Rule 11(b) where two of plaintiff's arguments

as to why several claims were not barred by the statute of limitations "[b]y any objectively reasonable standard . . . plaintiff had absolutely no chance of winning"), aff'd, 82 Fed. Appx. 723 (2d Cir. 2003); Caisse Nationale, 28 F.3d 259 (affirming sanctions award, holding "preposterous," among others, defendant's contention that a loan agreement (on which it had defaulted) was void for lack of consideration).

**2. Lead Counsel Violated Rule 11(b)(3)**

Plaintiffs also violated Rule 11(b) by advancing allegations and other factual contentions that not only lacked any evidentiary support, but were directly refuted by the public filings readily available to Plaintiffs. These include, inter alia, the Plaintiffs' core allegations that (1) the BIP was a known failure from 2002; (2) net attrition in 2003 was 17% rendering all of the Company's attrition disclosures false and misleading; (3) the Company was "masking attrition" through acquisitions; and (4) the Company promised to hedge 100% and essentially guaranteed its ability to pass on price increases. Had any reasonable inquiry been conducted by Plaintiffs' counsel, as required under Rule 11, they would have realized that these contentions were devoid of any evidentiary support.

Under settled authority, Lead Counsel indisputably violated Rule 11(b)(3) by presenting, as "fact," contentions that simply had no basis in fact. See Polar Int'l Brokerage Corp. v. Reeve, 196 F.R.D. 13, 16 (S.D.N.Y. 2000) (Scheindlin, J.) ("[P]laintiffs' repeated attempts to bolster their objectively unreasonable claims of misstatement and omission by exaggerating, mischaracterizing and ignoring the plain language of relevant documents is sanctionable conduct under Rule 11(b)(3) which prohibits counsel from making unsupported factual contentions.") (citation omitted), aff'd sub nom., Corroon v. Reeve, 258 F.3d 86 (2d Cir. 2001). See also O'Brien v. Alexander, 101 F.3d 1479, 1490 (2d Cir. 1996) (affirming sanctions where

representation concerning prior litigation was "totally lacking in evidentiary support and flatly contradicted by Judge Haight's decision").

Lead Counsel's professed reliance on their "industry expert" and other confidential witnesses ("CWs") does not relieve them of their obligation to check the Company's readily available public filings to determine the factual validity of the CWs' assertions. See Security Farms v. Int'l Brotherhood of Teamsters, 124 F.3d 999, 1017 & n.24 (9th Cir. 1997) (imposing sanctions on attorney for "blindly relying" on private investigator's representations); Chapman & Cole v. Itel Container Int'l, 865 F.2d 676, 685 n.11 (5th Cir. 1989) (holding that attorney's reliance on "unverified hearsay" did not satisfy requirement of reasonable inquiry under Rule 11(b)). Accordingly, pursuant to section 21D(c) of the PSLRA, 15 U.S.C. § 78u-4(c), and Rule 11, mandatory fee shifting should be imposed on Lead Counsel in the amount of Defendants' reasonable attorneys' fees incurred in this action, including the instant motion.

### C. The PSLRA Requires the Court to Impose Sanctions Such As Mandatory Fee Shifting if It Determines that Rule 11(b) Has Been Violated

"The PSLRA . . . does not in any way purport to alter the substantive standards for finding a violation of Rule 11, but functions merely to reduce courts' discretion in choosing whether to conduct the Rule 11 inquiry at all and whether and how to sanction a party once a violation is found." Simon DeBartolo Group, L.P., v. Richard E. Jacobs Group, 186 F.3d 157, 167 (2d Cir. 1999). As the Second Circuit has explained:

> Unlike the usual Rule 11 controversy in which, under the terms of the Rule, sanctions are discretionary, this one is governed by the PSLRA, which provides: "If the court makes a finding under [the mandatory review provisions of the statute] that a party or attorney violated any requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint ... the court shall impose sanctions on such party or attorney in accordance with Rule 11 of the Federal Rules of Civil Procedure."

Id. at 177 (quoting 15 U.S.C. § 78u-4(c)(2)) (alteration in original). This provision of the PSLRA was the result of Congress' recognition of "'the need to reduce significantly the filing of meritless securities lawsuits without hindering the ability of victims of fraud to pursue legitimate claims," Id. at 166-67 (quoting H.R. Conf. Rep. No. 104-369 (1995), reprinted in 1995 U.S.C.C.A.N. 730), and because of its conclusion "that the '[e]xisting Rule 11 has not deterred abusive securities litigation,' the 104th Congress included in the . . . PSLRA a measure intended to put 'teeth' in Rule 11." Id. at 167; accord Gurary v. Nu-Tech Bio-Med, Inc., 303 F.3d 212, 219 (2d Cir. 2002).

Section 21D(c) of the PSLRA "adopts a rebuttable presumption that the appropriate sanction for a complaint that substantially fails to comply with Rule 11(b) 'is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred in the action.'" Simon DeBartolo Group, 186 F.3d at 167 (quoting 15 U.S.C. § 78u-4(c)(3)(A)(ii)). "[O]nce a substantial violation is found, the existence of some non-frivolous claims does not suffice to rebut the statutory presumption on the ground that full sanctions would be an unreasonable and unjust burden." Gurary, 303 F.3d at 222.

### D. Mandatory Fee Shifting Is Especially Appropriate Under the Circumstances Here

Mandatory PSLRA sanctions such as fee shifting are especially warranted here, where Plaintiffs persisted in advancing knowingly erroneous legal and factual positions that were directly refuted by the Company's public findings, even after being put on notice of the defects by Defendants and admonished by the Court. Under these circumstances, courts have not hesitated to impose mandatory fee shifting.

For example, courts have readily imposed sanctions under the PSLRA where, as here, a plaintiff has advanced factual arguments and legal claims that ignore, or are refuted by,

the defendant's actual public disclosures. For example, in Sable v. Southmark/Environ Capital Corp., 819 F. Supp. 324 (S.D.N.Y. 1993), Judge Mukasey dismissed a federal securities law complaint because, as here, the alleged misrepresentations (1) were based on facts that were actually disclosed in defendants' offering documents, (2) were not material and (3) were inactionable under the bespeaks caution doctrine given defendants' abundant warnings. 819 F. Supp. at 333-336. The court then granted sanctions under Rule 11 against plaintiffs for the "carelessness of plaintiffs' counsel in making 'reasonably inquiry'" – especially in claiming that "facts clearly disclosed in the [offering documents] were either not disclosed or 'buried.'" Id. at 343.[9] See also Aizuss v. Commonwealth Equity Trust, 847 F. Supp. 1482, 1492 (E.D. Ca. 1993) (imposing Rule 11 sanctions where offering documents disclosed the information plaintiffs alleged "was fraudulently concealed."); Kushner v. D.B.G. Prop. Investors, Inc., 793 F. Supp. 1161, 1181-82 (S.D.N.Y. 1992) (awarding sanctions under the PSLRA where plaintiffs "ignore[d] the substantial disclosure in the private placement memoranda.")

Indeed, courts have emphasized that mandatory fee shifting is especially appropriate where, as here, Plaintiffs have been put on notice of the frivolousness of their Complaint but nevertheless persist in advancing a baseless position. As the Advisory Committee noted, a litigant's "obligations with respect to the contents of [papers filed with the Court] are not measured solely at the time they are filed or submitted to the Court, but include reaffirming to the Court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit." O'Brien v. Alexander, 101 F.3d 1479, 1489 (2d Cir. 1996) (quoting Fed. R. Civ. P. 11, Advisory Committee Notes for 1993 Amendments) (emphasis

---

9 The Court also imposed sanctions for the additional reason – equally applicable here – that plaintiffs persisted in "groundless claims after a direct admonition, and thereby 'cause[d] unnecessary delay and needless increase in the cost of litigation." Id.

added); see also Burekovitch v. Hertz, No. 01-CV-1277 (ILG), 2001 WL 984942 at *13 (E.D.N.Y. July 24, 2001) (imposing sanctions where plaintiff was advised by defendant of the lack of valid state law securities claim but nonetheless refused to withdraw it); Polar Intern. Brokerage Corp v. Reeve, 196 F.R.D. 13, 16 (S.D.N.Y. 2000) (imposing Rule 11 sanctions where federal securities law pleading was in "clear violation of the pleading requirements of Rule 9(b)" and where court and opposing counsel had advised plaintiffs of weakness of pleading), aff'd in part, dismissed in part on other grounds sub nom. Corroon v. Reeve, 258 F.3d 86 (2d Cir. 2001). In this case, Plaintiffs were put on plain and unequivocal notice of the several separate and independent deficiencies in their pleading, including their frivolous contentions about the BIP, attrition, hedging and the Class Period, but nonetheless insisted on pressing their baseless claims up through oral argument.

Where, as here, a plaintiff's claim is fundamentally flawed or woefully inadequate, courts have repeatedly awarded mandatory fee shifting under the PSLRA. See, e.g., Abner Realty, Inc. v. Administrator of General Services Admin., No. 97 Civ. 3075 (RWS), 1998 WL 410958 at *7 (S.D.N.Y. July 22, 1998) (fee shifting where fraud claim was "woefully inadequate and fatally flawed"). Indeed, Plaintiffs' persistent attempt to manufacture liability as far back as August 2002 based upon the Company's disclosures concerning a business improvement plan that was not even implemented until 2003, much less put to its first real test, is the quintessence of frivolity. Even a cursory review of the Company's public filings readily revealed the factual baselessness of Plaintiffs' persistent claim that the BIP was a failure from its inception in 2002. To be sure, Lead Plaintiffs' motive to elongate the Class Period to cover purchases dating back to 2002 was obvious -- as it secured their place in the case and created a platform, albeit a baseless one, for 1933 Act claims against a wide array of additional perceived deep pockets -- their legal

position that purchases dating back to 2002 could give rise to a securities claim based on events and disclosures that did not occur until 2003 and later was legally indefensible.

Under these circumstances, the Second Circuit Court of Appeals has held that the district court abused its discretion in not imposing sanctions under the PSLRA. Gurary v. Winehouse, 235 F.3d 792, 799 (2d Cir. 2000). In Gurary, like here, plaintiffs attempted to assert a federal securities law claim under Section 10(b) based on alleged misrepresentations or omissions that occurred after – and thus could not possibly have been "in connection with" – a plaintiff's purchase of securities. Id. The Court of Appeals held that sanctions were mandated because purchases that occurred "before any alleged deception began . . . could not be in connection with the purchase or sale of a security." 235 F.3d at 799, 800; accord, e.g., Aizuss v. Commonwealth Equity Trust, 847 F. Supp. 1482, 1492 (E.D. Ca. 1993) (imposing Rule 11 sanctions where most plaintiffs purchased their securities prior to the alleged misrepresentations and thus could not have relied on or been misled by such misrepresentations). Likewise here, the vast majority of the share purchases represented by Plaintiffs' overblown Class Period occurred months – if not years – before any possible misrepresentation relating to the BIP or the Company's ability to withstand the effect of the spike in oil prices in 2004.

Courts have also recognized the propriety of sanctions such as imposition of mandatory fee shifting where, as here, a plaintiff files a meritless motion for reconsideration or to reopen a judgment. For example, in Binghamton Masonic Temple, Inc. v. Bares, 168 F.R.D. 121, 128 (S.D.N.Y. 1996), the court held plaintiffs' motion pursuant to Fed. R. Civ. P. 59 to alter or amend the court's decision dismissing plaintiffs' frivolous claims further supported an inference of improper purpose to warrant sanctions, especially where – as the Court held here – the plaintiffs failed to identify any valid basis for such motion, such as law overlooked by the

court, a change in law or new evidence previously unavailable. 168 F.R.D. at 128. Similarly, in Adams v. Ultralinks, Inc., No. 03 Civ. 5384 (SAS), 2005 WL 1863829, at *4 (S.D.N.Y. Aug. 5, 2005), Judge Scheindlin held that she had "no choice" but to impose PSLRA cost-shifting based on the plaintiffs' filing of a Rule 60(b) motion to vacate a judgment dismissing plaintiffs' federal securities law claims, where the motion was based on "newly discovered evidence" that – exactly like here – "was not only publicly available at the time of the Court's previous Order granting defendants' motion to dismiss, but was clearly referred to in [defendant's] brief in opposition to that motion; and which was, in any case, of no particular relevance to the Court's prior Order." Because Plaintiffs' ill-conceived motion to alter or amend the Court's judgment of dismissal, and their request for leave to file yet another amended pleading – despite the Court's unequivocal warnings at the pre-motion conference – wholly failed to comply with the applicable standards, lacked merit and exacerbated the already exorbitant costs of defending this meritless securities law action, they further warrant the imposition of mandatory fee shifting under Rule 11.

**E. The Violations of Federal Rule 11(b) A Substantial, Warranting the Award of Defendants' Reasonable Attorneys' Fees and Other Expenses Incurred in this Action**

Section 21D(c) of the PSLRA sets forth the procedures for "Sanctions for Abusive Litigation." As applied to complaints, "[s]ection 21D(c) adopts a rebuttable presumption that the appropriate sanction for a complaint that substantially fails to comply with Rule 11(b) 'is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred in the action.'" Simon DeBartolo Group, 186 F.3d at 167 (quoting 15 U.S.C. § 78u-4(c)(3)(A)(ii)). "[O]nce a substantial violation is found, the existence of some non-frivolous claims does not suffice to rebut the statutory presumption on the ground that full sanctions would be an unreasonable and unjust burden." Gurary, 303 F.3d at 222.

As a matter of law, the presence here of indefensible baseless claims is more than sufficient to mandate the imposition of sanctions – even if Lead Plaintiffs could possibly defend some of the defective claims as non-frivolous. In Gurary, for example, even though frivolous claims were accompanied by non-frivolous ones, the Second Circuit held that sanctions in the full amount of defendants' reasonable attorneys' fees and costs, including the costs of the motion for sanctions, still were appropriate. See id. at 224 (10b-5 claims based on two transactions held frivolous while two were held merely meritless); cf. de la Fuente, 259 F. Supp. 2d at 274-75 (holding plaintiff substantially violated Rule 11(b) where it advanced frivolous arguments as to why its claims should not be dismissed as to seven of ten time barred claims). The Court of Appeals in Gurary also rejected the contention that the presence of any non-frivolous allegation sufficed to render the Rule 11 violation insubstantial, see Gurary, 303 F.3d at 221, holding that "a substantial violation occurs whenever the non-frivolous claims that are joined with frivolous ones are insufficiently meritorious to save the complaint as a whole from being abusive," see id. at 222. As the Court summarized:

> [I]n cases of this sort, the district court must first determine whether frivolous claims in violation of Rule 11 have been brought. If they have, the court must examine whether non-frivolous claims have been joined and, if so, whether these claims-whatever their number-are of a quality sufficient to make the suit as a whole nonabusive and the Rule 11 violation not substantial. If no such weighty non-frivolous claims are attached, the statutory presumption [in favor of an award of attorneys' fees and costs incurred in the action] applies.

Id. at 223. A fortiori where, as here, all of Plaintiffs' claims are frivolous, the Court should not hesitate to grant a full award of "reasonable attorneys fees and other expenses incurred in the action." 15 U.S.C. § 78u-4(c)(3)(ii).

**CONCLUSION**

For all of the foregoing reasons, Defendants respectfully request that the Court conduct a Rule 11 review of the amended complaint dismissed by the Court and award mandatory fee shifting as contemplated by Section 21D(c) of the PSLRA. Defendants respectfully submit that the Court should award Defendants all of reasonable attorneys' fees and expenses incurred by any and all defendants named in the Amended Complaint in moving to dismiss, opposing Plaintiffs' motion for reconsideration and to alter and reopen this Court's August 23, 2006 judgment of dismissal and to file a second consolidated amended complaint, and in bringing this Motion.

Respectfully submitted,

Skadden, Arps, Slate, Meagher & Flom LLP

Jonathan J. Lerner (ct10605)
Maura B. Grinalds (phv0521)
Shannon Lazzarini, Esq.
Four Times Square
New York, New York 10036
Phone: (212) 735-3000
Fax: (212) 735-2000

Day Pitney LLP

James F. Stapleton (ct04267)
Thomas D. Goldberg (ct04386)
Terence J. Gallagher (ct22415)

By: /s/ Thomas D. Goldberg
One Canterbury Green
Stamford, CT 06901
Phone: (203) 977-7300
Fax: (203) 977-7301

*Attorneys for Defendants Star Gas Partners L.P., Star Gas LLC, Irik P. Sevin, Audrey L. Sevin and Ami Trauber*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 3, 2007, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Terence J. Gallagher

Terence J. Gallagher
Day Pitney LLP
One Canterbury Green
Stamford, CT 06901
Phone: (203) 977-7300
Fax: (203) 977-7301