UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---

*In re Star Gas Securities Litigation*

Civil No. 3:04cv1766(JBA)

September 30, 2010

---

RULING ON MOTION FOR RULE 11 SANCTIONS

Following this Court's ruling granting Defendants' motion to dismiss all claims, its subsequent judgment, and the Second Circuit's affirmance, *see generally Rosner v. Star Gas Partners, L.P.*, 244 F. App'x 641 (2d Cir. 2009), Defendants Star Gas Partners, L.P. ("Star Gas"), Star Gas LLC, Irik P. Sevin, Audrey L. Sevin, and Ami Trauber collectively moved pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4 for a Federal Rule of Civil Procedure 11(b) review of the Amended Complaint and for reasonable attorneys' fees and expenses incurred by Defendants in (1) moving to dismiss the Amended Complaint; (2) opposing Plaintiffs' motion to modify the judgment of dismissal and file a second amended complaint; and (3) bringing this motion.

I.     Background

The factual background to this lawsuit is described at length in the Court's ruling dismissing the suit for failure to state a claim pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). (*See generally* Aug. 21, 2006 Rul. [Doc. # 216].)  The facts relevant to this motion follow.

In their Consolidated Amended Complaint ("CAC"), three lead Plaintiffs appointed pursuant to the PSLRA, as well as two "representative Plaintiffs" not appointed by the Court, who purported to represent a class of investors who bought Star Gas shares in reliance on

a September 2002 prospectus and an August 2003 prospectus, sued Defendants under Sections 10(b) and 20(a) of the Exchange Act (15 US.C. §§ 78j(b) and 78(t)(a)) (the 1934 Act), and Rule 10b–5 promulgated thereunder (17 C.F.R. § 240.10b–5), as well as Sections 11, 12, and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2) and 77o) (the 1933 Act). The claimed class period ran from August 1, 2002 through October 18, 2004, when the price of Star Gas stock collapsed on announcement that Star Gas would not issue a quarterly distribution and was unable to meet borrowing conditions under its working capital line.

A.     Plaintiffs' Fraud Claims

Plaintiffs alleged in their CAC that Defendants made false and misleading statements in violation of the 1933 Act, 1934 Act, and Rule 10b–5, to artificially inflate star Gas's share price in order to "pav[e] the way for several unit offerings during the Class Period, totaling approximately $96.1 million," and to "obtai[n] numerous bank borrowing during the Class Period of $235 million." (CAC [Doc. # 149] at ¶¶ 159–60.) Plaintiffs further alleged that the cash raised was "used, in significant part, to finance quarterly distributions to unitholders, which yielded "huge amounts of money" for the Defendants. (*Id.* at ¶ 160.) In support of their fraud claims, Plaintiffs alleged that Defendants misled investors as to the health and stability of Star Gas's Business Process Redesign Improvement Program ("BIP"); Star Gas's customer attrition rates; the extent to which Defendants masked customer attrition with new acquisitions; and Star Gas's failure to adequately hedge against a sharp rise in heating oil prices.

1.     *BIP*

Plaintiffs' fraud allegations in the CAC under both the 1933 Act and the 1934 Act focused predominately on Star Gas's implementation of the BIP, initiated in April 2002 to

improve the operations of its heating–oil subsidiary, Petro Holdings, Inc. ("Petro"). Central to Plaintiffs' assertions that Defendants misrepresented their efforts to implement the BIP was "the creation and utilization of a modern call center and centralized dispatch center." (CAC at ¶ 6.) Plaintiffs explained that "[t]he development and growth of the call center and the centralized dispatch center ultimately became known as the BIP," and "[a]ccording to a press release issued by Star Gas on April 30, 2003 [its creation was] intended to increase efficiency and enable Star Gas to take advantage of the heating oil industry's fractionalized configuration to build a brand image to grow both organically and through acquisitions." (*Id.*)

Plaintiffs alleged that Defendants misrepresented the strength of Star Gas's customer service—of which the call center was the central element—in its September 2002 and August 2003 prospectuses, upon which Plaintiffs relied when purchasing shares of Star Gas stock. Plaintiffs also alleged that Defendants misled investors in their assertions that the BIP was enabling Star Gas to "operate more cost effectively and with greater customer sensitivity," made in a November 1, 2002 press release; that the "call center is operating superbly," made during a August 6, 2003 conference call; and that "[t]he improvement in customer service that we expected is in progress. . . . It takes training, it takes re-education. . . . We're slowly, but surely improving the customer service level," made during a December 4, 2003 conference call.

Although Plaintiffs alleged that Defendants misled investors as to the viability of the BIP and the absence of problems with the call center as early as August 2002, Plaintiffs also alleged that problems with the call center first arose during the 2003/2004 Winter, when demand for heating oil increased dramatically, and only after Star Gas outsourced the call

center in May 2003 to Canada.  According to Plaintiffs' Confidential Witness ("CW") 4, a former Customer Service Supervisor at Petro upon whom Plaintiffs relied in setting forth facts in support of their fraud claims, the Canadian call center "did not know how to adequately handle customer service calls, billing or pricing issues," and "following the creation of the [Canadian] call center, the number of complaints lodged by Petro's customers increased dramatically." (CAC at ¶¶ 55–56.)  Nonetheless, from filing the CAC through oral argument on Defendants' motion to dismiss, Plaintiffs' counsel maintained that the BIP "was a problem program from the beginning," and as of the "very first day of our class period . . . defendants were aware of the fact that the program was failing." (Oral Arg. Tr., Ex. 4 to Lerner Aff. at 9:1–8.)

### 2. *Customer Attrition*

As another basis for their fraud claims, Plaintiffs alleged in the CAC that Defendants dramatically under–reported Star Gas's net customer attrition after the Canadian call center opened.  They alleged that Defendants announced false attrition rates on four occasions, including 0.4 percent average annual attrition for the three years ending September 30, 2002; 1.3 percent average annual attrition for three years ending September 30, 2003; a three percent loss of customer base for the quarter ending March 31, 2004; and a four percent loss of customer base for the quarter ending June 30, 2004.  Plaintiffs also maintained in the CAC, briefing in opposition to Defendants' motion to dismiss, and at oral argument that Defendants' net customer–attrition rate ranged from 17 to 20 percent and was significantly higher than the 0.4– to four–percent range Defendants reported.

Plaintiffs based their claimed net–attrition range falsehood on reports from CW 12 and CW 7.  CW 12, an Information Technology Support Specialist from October 2001 to

November 2004, reported to Plaintiffs that in a February 2004 meeting, "Defendant Sevin announced that in 2003, Petro experienced *an average customer attrition rate of 17%*." (CAC at ¶ 76, emphasis in original.) CW 7, a Petro truck driver from Maspeth, New York, "reported that for his/her region, there was a 'huge' (estimated 20%) drop in customers during 2003." (*Id.* at ¶ 65.) Plaintiffs repeatedly asserted in opposing the motion to dismiss and at oral argument that Sevin's 17–percent attrition estimate as reported by CW 12, and the attrition figure provided by CW 7, both referred to *net* customer attrition customer losses after offsetting customer gains. Plaintiffs' counsel explained during oral argument on the motion to dismiss that

> [i]t was our understanding, based upon the discussions we had with the witnesses, that the one comment that we refer to by Mr. Sevin was made at a meeting in Stamford where he referred to a 17% attrition rate for 2003. It's our understanding that was a net attrition rate, and that's the intent that we had when we framed the complaint.

(Oral Arg. Tr. at 6:13–23.) Meanwhile, Star Gas's publicly available 2005 10–K stated that in 2003, the company experienced *gross* customer losses of 16.4 percent, offset by gross customer gains of 14.9 percent, resulting in *net* customer attrition of 1.5 percent.

### 3. *Masking Attrition*

Based on their CWs, Plaintiffs also alleged in the CAC that Star Gas "was masking its alarming attrition levels through its numerous acquisitions." (CAC at ¶ 128.) Plaintiffs did not make reference to any specific reports or any observations from CWs in the CAC support the allegations that Defendants were masking attrition with acquisition. In its 2003 Form 10–K, Star Gas stated that its listed customer attrition rate was *exclusive* of customers added through new acquisitions. (*See* Ex. L to Lerner Aff. at 12 ("heating oil segment experienced average annual attrition of 1.3%, excluding the impact of acquisitions").)

### 4.    Hedging

As another basis for their fraud claims, Plaintiffs alleged that Defendants misrepresented the extent to which Star Gas hedged.  Star Gas's 2002 and 2003 Form 10–Ks stated

> The Partnership primarily uses derivative financial instruments to manage its exposure to market risk related to change in the current and future market price of home heating oil, propane, and natural gas.  The Partnership believes it is prudent to minimize the variability and price risk associated with the purchase of home heating oil and propane, accordingly, it is the Partnership's objective to hedge the cash flow variability associated with forecasted purchases of its inventory held for resale through the use of derivative instruments where appropriate.  To a lesser extent, the Partnership also hedges the fair value of inventory on hand or firm commitments to purchase inventory.  To meet these objectives, it is the Partnership's policy to enter into various types of derivative instruments to (i) manage the variability of cash flows resulting from the price risk associated with forecasted purchases of home heating oil, propane, and natural gas and (ii) hedge the downside price risk of firm purchase commitments and in some cases physical inventory on hand.

(CAC at ¶ 111.)  Plaintiffs claimed in the CAC that because Star Gas did not hedge 100 percent of its risks, but rather hedged only 47 percent according to an unidentified expert witness, Defendants "failed to disclose and/or misrepresented the fact that the Partnership did not adequately hedge against a sharp rise in heating oil prices during the Class Period and left the Partnership vulnerable to a financial disaster."  (*Id.* at ¶ 112.)  While Star Gas's 2002 and 2003 Form 10–Ks, as well as the August 13, 2003 Prospectus also stated that Star Gas hedged a "substantial majority" of its risks due to inventory on–hand and price–capped contracts, Plaintiffs did not rely on this "substantial majority" language as misleading in the CAC.

B.      Procedural Background

The Court dismissed all of Plaintiffs' claims on August 21, 2006, and judgment entered against Plaintiffs on August 23, 2006. On September 7, 2006, Plaintiffs moved to alter judgment and for leave to amend the complaint, which the Court denied on March 23, 2007. In the proposed Second CAC, Plaintiffs dropped all allegations that prior to the 2003–2004 winter seasons, Defendants misrepresented Star Gas's prospects based on the call center's success and abbreviated the Class Period to run from December 4, 2003 through October 18, 2004 inclusive. On April 3, 2007, Defendants moved for a mandatory Rule 11 inquiry and mandatory fee shifting. After Plaintiffs appealed on April 20, 2007, Defendants' motion was denied on consent and without prejudice to refile following issuance of the Mandate from the Second Circuit. The Second Circuit affirmed dismissal of all of Plaintiffs' claims, and Defendants moved again for a Rule 11 inquiry and fee–shifting.

II.      Standard

A.      PSLRA

The PSLRA provides:

(1) Mandatory review by court

In any private action arising under this chapter, upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion.

(2) Mandatory sanctions

If the court makes a finding under paragraph (1) that a party or attorney violated any requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion, the court shall impose sanctions on such party or attorney in accordance with

Rule 11 of the Federal Rules of Civil Procedure. Prior to making a finding that any party or attorney has violated Rule 11 of the Federal Rules of Civil Procedure, the court shall give such party or attorney notice and an opportunity to respond.

15 U.S.C. § 78u–4(c). "The PSLRA does not in any way purport to alter the substantive standards for finding a violation of Rule 11, but functions merely to reduce courts' discretion in choosing whether to conduct the Rule 11 inquiry at all and whether and how to sanction a party once a violation is found." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 579 F.3d 143, 152 (2d Cir. 2009) (citation and emphasis omitted).

B.      Rule 11

Rule 11(b) in turn states in relevant part:

By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Rule 11(b)(2) is violated when a party's "claims, defenses, and other legal contentions" are not "warranted by existing law" or are or border on the frivolous. *Healey v. Chelsea Resources Ltd.*, 947 F.2d 611, 626 (2d Cir. 1991). An argument or legal contention on the part of an attorney or client presenting papers "constitutes a frivolous legal position . . . if, under an 'objective standard of reasonableness,' it is clear . . . that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands."

*Caisse Nationale de Credit Agricole–CNCA v. Valcorp.*, 28 F.3d 259, 264 (2d Cir. 1994) (internal citations omitted).

Rule 11(b)(3) is violated if "after reasonable inquiry, [no] competent attorney could [] form a reasonable belief that the pleading is well grounded in fact." *Kropelnicki v. Siegel*, 290 F.3d 118, 131 (2d Cir. 2002) (internal citations omitted). Totally unsupported factual contentions are sanctionable under Rule 11(b)(3). *Storey v. Cello Holdings, LLC*, 347 F.3d 370, 388 (2d Cir. 2003).

III.    Discussion[1]

A.    Rule 11 Violations

Defendants assert that Plaintiffs' lead counsel violated Rule 11(b)(2) by filing frivolous legal claims including

> (1) Plaintiffs' claims under the 1933 Act which related to prospectuses issued and disclosures made months, if not years, before the alleged omissions could even have been made; (2) Plaintiffs' claims against the Underwriter

---

[1] Plaintiffs contend that Defendants' motion was untimely filed on April 3, 2007, because judgment entered against Plaintiffs on August 23, 2006. Although PSLRA Section 78u–4(c), which mandates that a court conduct a inquiry under Rule 11(b) "upon final adjudication of the action" includes no other time requirement, Plaintiffs look to the time–limits for moving to alter or amend a judgment (14 days) and for motions under Rule 11(c) (21 days) to support their argument that Defendants failed to move for the PSLRA–mandated inquiry in a timely manner. However, Plaintiffs cite no other authority for their contention that the PSLRA requires a motion for a Rule 11 inquiry be filed within a particular time–frame. More significantly, Plaintiffs moved to modify the judgment under Federal Rules of Civil Procedure 59(e) and 60(b) two weeks after judgment entered, and Defendants awaited the Court's ruling on that motion finally adjudicating the action, before moving under Section 78u–4(c) for a mandatory Rule 11 inquiry. Even if Section 78u–4(c) imposed a clear time limit for seeking a Rule 11 inquiry, the relevant date from which that time limit would run would have been March 23, 2009, the date the Court ruled on Plaintiffs' motion to modify the judgment, which was only eleven days before Defendants so moved. Therefore, Defendants' motion was timely.

Defendants which rested exclusively on these inactionable prospectuses; (3) Plaintiffs' claims against the remaining defendants under the 1934 Act based on these same early disclosures, or on alleged omissions or misrepresentations that were refuted by the Company's public filings or precluded under controlling authority immunizing an issuer from liability for statements of general corporate optimism and statements that bespoke caution; and (4) Plaintiffs' attempts to assert fraud claims against Defendants without meeting the stringent standards for pleading scienter.

(Mem. Supp. [Doc # 241–1] at 18.) Defendants also contend that Plaintiffs' lead counsel violated Rule 11(b)(3) by advancing core allegations that (1) the BIP was a failure known to Defendants from 2002; (2) 17 percent net attrition in 2003 rendered all of the Company's attrition disclosures false and misleading; (3) Star Gas "masked attrition" through its acquisitions; and (4) Star Gas promised to hedge 100 percent, essentially guaranteeing its ability to pass on price increases.

1. BIP

Defendants argue that Plaintiffs' lead counsel's allegations that Defendants misrepresented the health and stability of the call center as early as August 2002, before problems with it actually arose, violated Rule 11(b)(3), because those allegations utterly lacked evidentiary support, and Plaintiffs' lead counsel's 1933 Act and 1934 Act fraud claims arising out of those allegations objectively had "no chance of success," thereby violating Rule 11(b)(2). The Court agrees.[2] As alleged, the CAC timeline would have made it impossible

_____

[2] In the Ruling granting Defendants' Motion to Dismiss, the Court recognized that

[P]laintiffs' primary charge regarding the deficiencies in the BIP are related to the establishment of the Canadian call center, which the complaint alleges occurred in Spring of 2003. [Am.] Compl. ¶ 9 (outsourcing arrangement was announced in a May 20, 2003 press release). Thus Star Gas could not have been under any obligation to disclose difficulties with the call center or the BIP prior to that time. The optimistic statements about the BIP that

for Plaintiffs to prove that the September 2002 and August 2003 prospectuses—pursuant to which Plaintiffs purchased shares of Star Gas—were untrue, a requisite for civil liability under the 1933 Act,[3] 1934 Act, and Rule 10b–5.[4]

_____

> [P]laintiffs challenge were all made between Fall 2002 and December 2003, and by Spring 2004, when, according to plaintiffs' allegations, the problems with the BIP had become apparent (over the 2003–2004 heating season), Star Gas was concomitantly more cautious about its projections for the BIP (the 4/29/04 press release stated Star Gas was realizing "the initial benefits from the Petro Division's [BIP]" which, however, "were not as significant as we has expected.").

(Rul. at 26–27.)

[3] Section 11 of the 1933 Act, 15 U.S.C. § 77k(a), creates civil liability when a registration statement "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." Similarly, Section 12(a)(2) creates liability civil for any person who "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements." Section 15 creates liability for persons who "controlled" those who violated either Section 11 or 12.

[4] Under Section 10(b) of the 1934 Act, 15 U.S.C. § 78j, it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe." Rule 10b–5, implementing Section 10(b), provides that it is unlawful

> (a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

(emphasis added).

The portion of the September 2002 Prospectus that Plaintiffs cited as fraudulent stated "[c]ompetition with other companies in the home heating oil industry is based primarily on *customer service* and price." (CAC at ¶ 105, emphasis in CAC) The portions of the August 2003 Prospectus that Plaintiffs said were fraudulent stated in relevant part:

> *We enhance customer loyalty with our responsive at–home heating equipment repair and maintenance service, which we make available 24 hours per day, 7 days a week.* . . . [B]ecause we sell heating oil with a pass–through pricing mechanism and maintain relatively low levels of inventory, *we are not generally affected by changes in the level of oil prices.* . . .

> In addition, *our size allows us to provide higher levels of customer service for significantly lower cost per customer than our competitors and employ product branding to enhance customer retention.* For example, in our heating oil operations, we are utilizing customer call center operations and technology–based service vehicle dispatch in order to *maximize customer responsiveness while reducing overall operating costs.* . . .

> We continue to increase the quality of our service offerings to our customers through the use of technology and by leveraging scale of our operations. We believe that these combined actions *will further enhance our position with existing and potential customers and allow us to maintain or improve our customer retention.*

(CAC at ¶ 122, emphasis in CAC) However, Plaintiffs' quoted their Cooperating Witnesses in the CAC as saying that the customer service problems Star Gas faced developed only *after* the Canadian call center was established and experienced its first winter season, in 2003–2004. Thus, statements highlighting customer service strengths, made before significant difficulties arose, could not possibly have been materially untrue so as to give rise to liability under the 1933 Act or 1934 Act. Because of these timing impossibilities, Plaintiffs' factual allegations that Defendants knowingly misrepresented the health and stability of the call center as early as August 2002 were utterly lacking in support, and their fraud claims based on the BIP had "no chance of success."

Plaintiffs nonetheless argue that even though problems with the call center may have begun during the 2003/2004 winter season, the call center was but one component of the BIP, and the mere fact that other elements of the BIP extended back to 2002, predating the call center, made their 1933 Act and 1934 Act claims not frivolous. However, even if Defendants implemented parts of the BIP as early as 2002, Plaintiffs' fraud claims under the 1933 Act and 1934 Act are predicated on the failures of the Canadian call center and resulting attrition; Plaintiffs did not allege that any elements of the BIP that began in 2002 failed or caused attrition. The call center is the only BIP element that was relevant to Plaintiffs' allegations, and its shortcomings simply could not have been the subject of liability–producing representations for the time–frame alleged; thus the existence of other BIP components that predated the call center but were not alleged to have caused Star Gas any difficulties or resulted in misrepresentations do not save the CAC from the frivolousness of the fraud claims arising out of allegations related to the call center.[5]

Plaintiffs pursued no novel legal argument that was not foreclosed by existing caselaw.[6] Nor did Plaintiffs merely provide an insufficient factual basis for scienter or

---

[5] Plaintiffs suggest that the alleged existence of other BIP components is comparable to the existence of non–frivolous allegations that the Second Circuit held saved frivolous allegations from violating Rule 11 in *Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group*, 186 F.3d 157, 174 (2d Cir. 1999). Yet unlike *Simon DeBartolo Group*, in which "there were non–frivolous allegations and arguments supporting each element of" the Rule 10b–5 cause of action, the mere existence of other BIP components, without any factual allegations about their viability or health in 2002 and 2003, or any assertion in the CAC that they were the bases of fraudulent misrepresentations by Defendants on which Plaintiffs relied, do not convert Plaintiffs' frivolous fraud allegations into non–frivolous claims.

[6] Plaintiffs cite *In re Initial Public Offering Securities Litigation*, 399 F. Supp. 2d 369 (S.D.N.Y. 2005), in which sanctions were not imposed where plaintiff investors' argued for an extension of law to allow victims of securities fraud to recover all damages attributable

misrepresentation.[7] Rather, Plaintiffs alleged facts that lacked any evidentiary support and could not have possibly given rise to liability under either the 1933 Act or the 1934 Act given the chronology alleged. Therefore, Plaintiffs' lead counsel violated both Rule 11(b)(2) and Rule 11(b)(3).

### 2. Attrition rates

Also central to Plaintiffs PSLRA fraud allegations against Defendants was that Defendants intentionally misrepresented net customer attrition rates during the class period, which Defendants say was utterly lacking in support and violated Rule 11(b)(3). To support their allegation that Defendants' net attrition figures were fraudulent and misleading,

---

to alleged artificial inflation of security values, even though those victims sold their purchased securities for a profit. Judge Scheindlin determined that the novel legal theories advanced, although unpersuasive, were not frivolous. *Id.* at 372. Plaintiffs also point to *In re Cross Media Marketing Corporation Securities Litigation*, 314 F. Supp. 2d 256 (S.D.N.Y. 2004), in which sanctions were not imposed where the CAC utilized group pleading, found not to be permitted under the PSLRA for scienter allegations, because "there was no circuit court authority to that effect prior to oral argument." *Id.* at 256.

[7] Plaintiffs look to *In re Nokia Oyj Securities Litigation*, 423 F. Supp. 2d 364 (S.D.N.Y. 2006), in which plaintiffs' 1934 Act claims were dismissed because the plaintiffs failed to plead scienter sufficiently, but Rule 11 sanctions were not imposed. The plaintiffs' basis for alleging scienter was a comment made during a conference call addressing Nokia's "areas of vulnerability," that plaintiffs interpreted to mean that defendants knew Nokia was not competitive in either mid–range or high–end phones and therefore Nokia's confidence in its projections during the class period were knowingly misguided. *Id.* at 404–405. *See also, e.g.*, *JSMS Rural LP v. GMG Capital Partners III, LP*, No. 04cv8591(SAS), 2006 WL 1867482, *4 (S.D.N.Y. 2006) (Rule 11 sanctions not imposed, even though plaintiff's Rule 10b–5 claim failed as a matter of law, because while it might "otherwise be possible to show *loss causation* in this case, plaintiff has neglected to indicate exactly how it suffered a *loss.*") (emphasis in original); *In re Progress Energy, Inc.*, 371 F. Supp. 2d 548 (S.D.N.Y. 2005) (sanctions not imposed even though defendants' omissions from a proxy for contingent value obligations of information about the applicability of the federal alternative minimum tax was not materially misleading).

Plaintiffs relied on what they claimed to be evidence that the actual net attrition rate during the period was between 17 and 20, a position Plaintiffs' counsel maintained through oral argument, but which lacked any evidentiary support.

There is no evidence that the numbers provided by CW 12 and CW 7, upon whom Plaintiffs relied in alleging that net attrition was in the 17– to 20–percent range, actually represented net attrition. CW 12 referred to "average attrition," as reported by Sevin, and CW 7 estimated a "20% . . . drop in customers during 2003" in his region. Neither of these numbers factored in gross customer gains, a fundamental component in calculating *net* attrition. Star Gas's publicly–available 2005 Form 10–K, upon which Plaintiffs relied elsewhere in the CAC, stated that *gross* attrition in 2003 was 16.4 percent (only 0.6 percent less than the attrition rate CW 12 said Sevin reported), and it further calculated that after gross customer gains, *net* attrition was 1.5 percent (only 0.2 percent less than the net attrition rate for 2003 Plaintiffs alleged Defendants stated fraudulently). Plaintiffs maintain they "were not, of course, required to assume the truth of Star Gas' own statements in its public filings," and were entitled to rely "on information provided by credible witnesses like the confidential witness quoted" for the 17–percent net attrition figure in the CAC (Pls.' Opp'n at 12), yet on this crucial point of *net* versus *gross*, there remains no relationship between what the Plaintiffs' "credible witnesses" said and the fraud claims Plaintiffs advanced. The testimony of CW 12 and CW 7 simply does not contradict or call into question the net attrition numbers Defendants publicly reported. In the absence of any evidence that actual net–attrition rates were between 17 and 20 percent, Plaintiffs' allegations that net–attrition rates ranged from 17 to 20 percent and were misrepresented by Defendants violated Rule 11(b)(3).

### 3. *Masking Attrition*

Plaintiffs also alleged in the CAC that Star Gas fraudulently masked "its alarming [customer] attrition levels through its numerous acquisitions." (CAC at ¶ 128.) However, in its 2003 Form 10–K, Star Gas stated that its listed customer attrition rate was *exclusive* of customers added through new acquisitions. (*See* Ex. L to Lerner Decl. at 12 ("heating oil segment experienced average annual attrition of 1.3% , excluding the impact of acquisitions").) Additionally, as noted in the ruling granting Defendants' motion to dismiss,

> [t]he 2002 Form 10–K does not contain such a specific limitation on its 0.4% [customer attrition] figure [for that year], but does state elsewhere that the additional gallons of propane and heating oil sold in fiscal 2002 were 'largely offset by the impact of significantly warmer temperatures and to a much lesser extent by customer attrition in the heating oil segment,' implying that the customer attrition figure provided is exclusive of acquisitions.

(Rul. at 33.) Therefore, "these Form 10–Ks do not reveal a plan to cover up high customer attrition with acquisitions, but fully disclose that the attrition rates are calculated prior to the offsetting effects of the acquisitions." (*Id.*) The CAC provides no basis for Plaintiffs' assertion that Star Gas intentionally "masked" customer attrition through acquisitions, other than to say that it was "revealed" by CWs. However, the CAC contains no CW statement related to the "masking" alleged, and the Form 10–Ks, relied upon by Plaintiffs elsewhere, clearly indicate that Defendants did not include acquisitions in their attrition figures and therefore could not have been masking these attrition numbers as Plaintiffs have suggested.

Plaintiffs' only argument in response to Defendants' charge that this allegation was unreasonable and frivolous is that "Lead Plaintiffs were not obligated to assume the truth of Star Gas' own statements in its public filings, and were entitled to allege, based on their reasonable inquiry, that the Partnership's stated attrition numbers, while purportedly

'excluding the impact of acquisitions,' in fact used acquisitions to mask true attrition in its operations." (Pls.' Mem. Opp'n at 13.) Plaintiffs rely on *Kramer v. Time Warner, Inc.*, in which the Second Circuit determined that judicial notice may be taken of the contents of public documents that were alleged to contain fraudulent misrepresentations, even if not exhibits to a complaint, for the proposition that SEC filings, such as Defendants' 10–Ks, are "relevant not to prove the truth of their contents but only to determine what the documents stated." 937 F.2d 767, 774 (2d Cir. 1991). Unlike *Kramer*, in which the plaintiff alleged specific reasons to question the reliability of SEC filings based on a reasonable inquiry, Plaintiffs here simply assert that Defendants' Form 10–Ks were presumptively fraudulent. However, at issue is not whether Plaintiffs were required to trust the content of Star Gas's 10–Ks. What is at issue is whether Plaintiffs' counsel's factual assertion in the CAC that Defendants masked attrition in those representations was justified after a reasonable inquiry. Had a reasonable inquiry been undertaken that produced statements from CWs that provided a basis for Plaintiffs' allegations, they would not be frivolous, just erroneous, but in the absence of any proffered basis for doubting the veracity of the Form 10–Ks, Plaintiffs' allegations that Defendants masked attrition with acquisitions are utterly lacking in support and therefore violate Rule 11(b)(3).

### 4. *Hedging*

Finally, Defendants urge as potentially frivolous Plaintiffs' allegations that Defendants' 2002 and 2003 Form 10–Ks were misleading because they stated that Star Gas adequately hedged risks, even though they did not hedge 100 percent of Star Gas's fixed–price contracts. While Star Gas never made a statement purporting to hedge 100 percent, its Form 10–Ks did state that it would hedge a "substantial majority" of its risks, and

according to Plaintiffs' unidentified expert witness, it only hedged 47 percent of such risks in fiscal year 2004. Although Plaintiffs claims were dismissed because the CAC failed to claim that the "substantial majority" language was misleading, claiming instead that Star Gas misleadingly suggested to investors that it had hedged *all* of its capped price contracts, it was not objectively unreasonable to assert that Defendants misrepresented the extent to which Star Gas hedged its risks, since 47 percent is, undisputedly significantly less than the "substantial majority" representation. Plaintiffs' hedging claims did not totally lack evidentiary basis, and this therefore did not violate Rule 11(b)(3).

B.     Substantiality of the Rule 11 Violation

Having determined that Plaintiffs' lead counsel violated Rules 11(b)(2) and 11(b)(3), the Court must now determine whether to impose sanctions. The PSLRA "establishes a presumption that, 'for *substantial* failure of any complaint to comply with any requirement' of Rule 11(b), the award shall be the full amount of the reasonable attorneys' fees and costs." *Gurary v. Nu–Tech Bio–Med, Inc.*, 303 F.3d 212, 215 (2d Cir. 2002) (quoting 15 U.S.C. § 78u-4(c)(3)(A)(ii) (emphasis in original)). In deciding whether a violation of 11(b) is "substantial," the Second Circuit has stated that once the court concludes that a frivolous claim has been brought in violation of Rule 11(b)

> the court must examine whether nonfrivolous claims have been joined and, if so, whether these claims—whatever their number—are of a quality sufficient to make the suit as a whole nonabusive and the Rule 11 violation not substantial. If no weighty nonfrivolous claims are attached, the statutory presumption applies.

*Id.* at 223.

The presumption of full attorney's fees and expenses may be rebutted if the court finds that the violation was "*de minimis.*" *See id.*; 15 U.S.C. § 78u–4(c)(3)(B)(ii). The Second

Circuit recognized in *Gurary* that "*de minimis* must mean something different from 'not substantial,'" *id.* at 223 n. 3, but it did not explicitly decide what would constitute a *de minimis* violation, offering only examples of what might be regarded as *de minimis*, which would still require at least partial sanctions 'to punish the party that brought the frivolous claims.'" *Chien v. Skystar Bio Pharm. Co.*, 256 F.R.D. 67, 77 (D. Conn. 2009) (quoting *Byrne v. BuyThisFast Network, Inc.*, No. 03 Civ.1999, 2005 WL 1155175, at * 5 (S.D.N.Y. May 17, 2005)).

Even though Plaintiffs' hedging allegations have been found non–frivolous, Plaintiffs' lead counsel's Rule 11(b)(2) and Rule 11(b)(3) violations were substantial. The mere existence of the non–frivolous claim does not render their Rule 11 violations insubstantial *see Gurary*, 303 F.3d at 220–21, because their non–frivolous hedging allegations were not of such weight and quality as to render the suit as a whole "nonabusive," given that Plaintiffs' frivolous allegations as to the BIP, Defendants' net attrition, and attrition–masking formed the basis in whole or in part for each claim asserted, "infect[ing] the entire pleading," Fed. R. Civ. P. 11 Advisory Committee Note (1993). Plaintiffs' only basis for extending the Class Period back to August 2002 was Plaintiffs' chronologically–impossible call–center–fraud claim.[8] Additionally, Plaintiffs were put on notice of the defects in their allegations from the pre–filing conference, in which Defendants were required to summarize all bases for their forthcoming motion to dismiss to afford Plaintiffs a chance to amend, which Plaintiffs

---

[8] Similarly, in *In re Australia & New Zealand Banking Group Limited Securities*, --- F. Supp. 2d ----, 2010 WL 1875728 (S.D.N.Y. 2010), the plaintiffs' mistaken assertion that defendant Australia and New Zealand Banking Group and its executives knew in March 2007 that it faced financial difficulties based on internal emails that were actually first circulated in March 2008, was substantial because it was the cornerstone of the complaint and the only basis for starting the class period in March 2007.

declined. Plaintiffs did not seek leave to file an amended complaint to address those defects until after the Court dismissed all of their claims, and instead in the meanwhile, reasserted their frivolous allegations in their opposition to Defendants' motion to dismiss and during oral argument. A litigant's responsibility for the substance of its Court filings "[is] not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have merit." *O'Brien v. Alexander*, 191 F.3d 1479, 1489 (2d Cir. 1996) (quoting Fed. R. Civ. P. 11 Advisory Committee Note (1993)). Thus, Plaintiffs' lead counsel's violations were substantial, creating a presumption for awarding all fees and costs for the entire litigation as sanctions.[9] The Rule 11 violations were not *de minimis*. The CAC did not suffer from a minor procedural flaw. Nor were the Rule 11 violations limited to one of many claims for relief.

Neither party has addressed what the full award of attorney's fees would be and whether an award would be an "unreasonable burden" on Plaintiffs and their counsel. As the Second Circuit explained in *Gurary*,

> both the ordinary meaning of 'unreasonable burden' and its context in the PSLRA indicate that the statute's unreasonable burden prong requires the sanctioned party to offer, through financial statements or other proof, evidence that the award is unreasonable and unjust, given the party's economic or other like status. Thus the district court is required to compare

---

[9] As the Second Circuit explained in *Gurary*, "Congress passed the statutory presumption in the PSLRA sanctions scheme in order to encourage 'defendants to fight abusive claims' and to 'compensate wholly victims of frivolous litigation," and "it seems most likely that Congress meant for the defendant to receive fees and costs pursuant to § 78u–4(c)(3)(A)(ii), including all reasonable expenses related to appellate proceedings." 303 F.3d at 225–26 (internal citations omitted).

the burden on the sanctioned party to the burden placed on the victim of the
the litigation, given the victim's financial or similar status.

303 F.3d at 221. The burden of raising this exception, and of proffering evidence to prove that it is applicable falls on the party sanctioned. *See In re Australia & New Zealand Banking Group Limited Securities*, ---F. Supp. 2d ----, 2010 WL 1875728, * 10 (S.D.N.Y. 2010) (citing *Gurary*, 303 F.3d at 221). That party must "offer some financial or other like statements, reflecting the claimed . . . consequences of imposing the sanctions award, if that is to be the basis of his rebuttal." *Gurary*, 303 F.3d at 225. In fairness to all parties, they will be given an opportunity to address what sanctions are sought and whether a full award presents an unreasonable burden, and who should be held jointly and severally liable.

IV.    Conclusion

Defendants' motion [Doc. # 241] for a Mandatory Rule 11 Inquiry and Mandatory Fee Shifting is GRANTED. In order for Plaintiffs to evaluate whether they will claim the unreasonable burden exception to a full award, they need to know what fee is claimed. Accordingly, Defendants shall submit their fee petition and claim of who should be held jointly and severally liable, by October 15, 2010. Plaintiffs' response to Defendants' petition and identification of liable persons, along with any claim to reduction under the unreasonable burden exception shall be filed by November 30, 2010. Defendants' reply shall be filed by December 21, 2010.

IT IS SO ORDERED.


/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 30th day of September, 2010.